# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | | |
|---|---|---|
| **DONELL L. TILLMAN,** *individually and on behalf of all others similarly situated,* | ) ) ) | |
| **Plaintiff,** | ) ) | **CIVIL ACTION NO.** |
| | ) ) | **2:16-cv-00313-UA-CM** |
| **v.** | ) ) | |
| **ALLY FINANCIAL INC.,** | ) ) | |
| **Defendant.** | ) ) ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO ALLY FINANCIAL INC.'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Donell Tillman opposes the Motion for Summary Judgment (Doc. 73) filed by Defendant Ally Financial, Inc. ("Ally") for the following reasons:

### I. Introduction

Ally's Motion for Summary Judgment seeks reconsideration of the motion to dismiss that this Court already denied. This Court has already ruled that Plaintiff suffered a concrete injury-in-fact sufficient for Article III standing. *Doc. 58*. Faced with the same arguments that Ally made in its Motion to Dismiss, the Court should again reject Ally's contention that Plaintiff does not have standing.

Also troubling is Ally's continued failure to address the controlling case from the Eleventh Circuit on this issue - *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. March 9, 2015). *Palm Beach*, a TCPA case like this one, expressly rejects Ally's arguments, yet Ally failed to mention the case in its motion to dismiss, and it again fails to mention it here even though Plaintiff raised it in response to the motion to

dismiss and this Court cited it in its order. *See* Doc. 34 at p. 8 and Doc, 58 at p. 7. The Court should not have to continually revisit this issue.

The only new argument made by Ally in its Motion is that Plaintiff lacks *statutory* standing. Yet this argument also fails because Plaintiff is the "regular user" of the cellular telephone that Ally called. The authority establishing statutory standing under the TCPA for the "regular user" of a cellular telephone is overwhelming. Ally's Motion for Summary Judgment should be denied.

## II. Statement of Additional Material Facts

1.      Plaintiff obtained the telephone line 561-201-████, and the cell phone assigned to it, in November 2015, when he went to a Metro PCS store to pay his phone bill. *Tillman Dep. Trans.* at 38:4-8 ("This number actually came because they told me to get a different phone. I went to Metro. I was trying to pay my old phone bill and they gave me this phone because it would be cheaper and the other phone was breaking.); 48:16 – 49:4 ("I went into Metro to pay the phone bill, but the bill was high and he told me – and I needed a new phone, too, so he just gave me it. He told me that phone would be better")

2.      When Plaintiff obtained the telephone line and cell phone at issue, he personally paid for the phone in cash. *Id.* at 59:2-10; 61:5-21.

3.      Plaintiff also pays for the phone bill for the use of the phone. *Id.* at 25:9 ("I pay for that phone"); 25:18-19 ("sometimes she'll pay the first part, which is for the other line, and I pay what's left.")

4.      Although Plaintiff's girlfriend's father, Mr. Charles, is the Metro PCS account holder, Mr. Charles does not use the telephone line or cell phone at issue. *Id.* at 20:3-5

(testifying that Mr. Charles does not use the phone); 26:23 – 27:4 (explaining that Mr. Charles has his own line).

5.      Plaintiff has been the primary and regular user of the cellular phone and number at issue since he obtained it.  *Id.* at 37:18 – 38:1 (referring to the phone as "my cell phone").

6.      Plaintiff uses the phone to communicate with his children and vice versa. *Id.* at 36:1-5.

7.       Plaintiff uses the phone to communicate with his employer and vice versa. *Id.* at 37:10-17.

8.      Plaintiff had the phone with him during his deposition. *Id.* at 42:1-4.

9.      Plaintiff does not share the phone with his girlfriend, who has only occasionally used it. *Id.* at 62:1-2 ("it's not her phone.  So I wouldn't say we really share the phone."); 23:4-11 (testifying that Plaintiff does not share the phone with his girlfriend when his girlfriend is around); 22:21-24 (testifying that Plaintiff uses the phone more than his girlfriend).

10.     Instead, Plaintiff's girlfriend primarily and regularly uses a different phone. *Id.* at 34:17-19.

11.     Nobody else uses Plaintiff's cell phone. *Id.* at 19:23 – 20:2.

12.     Shortly after Plaintiff obtained the phone number, Ally began placing automated and prerecorded calls to the number, asking to speak to an unknown person named Phillip Everett. *Id.* at 71:25 – 72:4; *Exhibit 1 - Collections History Summary* (showing first dialer call to Plaintiff on November 18, 2015).

13.     Plaintiff repeatedly answered and told Ally that it was calling the wrong number, but Ally did not stop calling. 72:23-24 ("I remember when he asked for the person he

was asking for, and I told him he had the wrong number."); 101:8-10 ("I told people they had the wrong number. I know it was more than one person I told that to.")

14.     In an attempt to get Ally's calls to stop, Plaintiff personally downloaded and personally paid for a purported call tracking and blocking application that Metro PCS offered called "Metro Block It" in January 2016. *Tillman Dep. Trans.* at 78:10 - 79:2 (testifying that he pays for the app); 80:14-20 (testifying that it was his decision alone to install the app).

15.     For the time period after Plaintiff was forced to install Metro Block It, Metro's records show that Plaintiff received twenty two (22) calls from Ally between January 20, 2016 and March 31, 2016. *Doc. 73-3 - Goldsmith Declaration* at Ex. B thereto (Metro call log); *Doc. 73-6 – id.* at ex. E thereto (Answer to Interrogatory #7); *Tillman Dep. Trans.* at 144:1-6.

16.     Ally's records show that it placed eighteen (18) automated dialer calls to Plaintiff before January 20, 2016 and five (5) automated dialer calls after March 31, 2016, for a total of forty-five (45) automated calls. *Exhibit 1 - Collections History Summary*.

17.     Plaintiff answered several of Ally's calls when the phone rang. *Tillman Dep. Trans.* at 71:25 – 72:4 ("when I answered, it was a voice saying Ally Financial or Allied Financial. Ally Financial. And I actually spoke to somebody saying Ally Financial -- saying they're from Ally Financial looking for Phillip, I think."); 72:13-18 ("And there was a -- I answered a call after that. It was like a automatic voice with a – it had like a accent, some -- it was like a lady accent, Ally Financial.").

18.     Plaintiff also answered several of Ally's calls through voicemail. *Id.* at 74:18 ("I heard it on my voicemail"); 75:9-10 ("it sounded like the same voice on my voice mail").

19. The Metro Block It application does not and cannot prevent calls from connecting to a cell phone; even calls that are "blocked" are still received by the phone. *First Orion Dep.* Trans. at 23:15-18 ("so the phone might light up. You might even hear a partial – what we call a 'partial ring' in some cases. *And then the app takes over and handles that call however it's going to handle it.*"); 23:15 ("the phone may still begin to receive a call"); 28:15-17 ("I personally have seen it take up to a second from the time the phone started to light up, if you will, to the time that the app blocked the call.")

20. Generally, once the call connects and the phone starts ringing, the app "blocks" the call and produces a pop up notification notifying the user of the blocking activity. *Id.* at 48:10-11 ("as the phone is ringing, this notification appears over the top of the incoming call.")

21. First Orion, the company that created the Metro Block It application, testified that for the version of the app that plaintiff used, the calls are not actually "blocked" at all - "the best we can do is send the call to voice mail." *Id.* at 22:3-4; 23:8 ("All blocked calls are sent to voice mail").

22. The Metro Block It application did not block any of Ally's calls. *See Tillman Dep. Trans.* at 214:11-12 ("if it's blocked, I still get a voice mail from the call."); 76:18-20 ("when I tried to block the number, that number kept coming in, so I blocked it again. Somehow they were just coming in."); 88:1-2 ("With my phone, the numbers, they kept calling. I could see the call."); 107:18-22 ("the Block-it app didn't seem like it was doing the job . . . there are voice mails that came in, but that app didn't block them."); 120:10-24 (testifying that the calls still "came in. It would show up on the phone somebody calling . . . I could seem the calling in still. It's like the app didn't work all the time . . . it tell you blocked as its calling."); 122:11-

5

12 ("it'll show you that you blocked the number calling you, so you can't answer it"); 122:18-20 ("it would just be a red . . . like your screen turn red and it show you the number you block, block number calling.  But it lets them call still."); 122:25 – 123:9 (testifying that the phone would still ring for blocked numbers and would also give a notification); 155:3-5 ("the numbers are still calling after blocked.  Most of the calls, I seen them coming in.")

23.     Plaintiff testified that Ally's calls violated his rights and invaded his privacy. *Id.* at 165:8-11, 194:2-3 ("they violated my rights, invaded my privacy")

### III.  Response to Ally's Statement of Facts

1.  At all times relevant to this case, Ms. Charles' father, Joseph Marcel Charles, who is not a party to this case, had a MetroPCS family plan account (hereinafter, the "Account"). **Admitted**.

2. The Account was in Mr. Charles' name. **Admitted.**

3. Prior to November 2015, Plaintiff sometimes used a cellular phone that was tied to the Account.  **Denied that Plaintiff only "sometimes used" the previous phone.  Plaintiff was the regular and primary user of the previous phone. *See Tillman Dep. Trans.* at 38:15-16 ("The first phone came from her dad.  He gave it to me."), 65:4-16 ("it was for me. Her dad really got the phone for me because I needed a phone.")**

4. In November 2015, Ms. Charles and Plaintiff visited a MetroPCS store, where Ms. Charles upgraded to a new cellular phone: specifically, the phone that is at issue in this case (the "Phone").  **Denied that Ms. Charles upgraded to a new phone.  It was Plaintiff that upgraded to and paid for a new phone, which is the phone at issue in this case.  *Id.* at 25:9, 25:18-19, 38:4-8, 48:16 – 49:4, 59:2-10, 61:5-21.**

5. In order to connect the Phone to the Account, Ms. Charles had to provide the PIN code for the Account. **Admitted**.

6. As Plaintiff put it at his deposition: "I don't know the PIN to the account, so I can't make a change." **Admitted**.

7. The phone number assigned to the Phone was 561-201-███. **Admitted**.

8. Plaintiff sometimes used the Phone but was not the only user of the Phone. **Denied that Plaintiff only "sometimes used" the phone and denied further that anybody else regularly used the phone.  Plaintiff was the primary and regular user of the cellular phone at issue.  *See Id.* at 36:1-5, 37:10-17, 37:18 – 38:1, 42:1-4.**

9. Plaintiff's girlfriend, Charnelle Charles, who is not a party to this case, sometimes used the Phone. **Admitted only that Plaintiff's girlfriend occasionally and infrequently used the phone. *See Id.* at 22:21-24, 23:4-11, 34:17-19, 62:1-2, 67:13-14 ("It's just like a day or two.")**

10. Ms. Charles was entitled to "[j]ust take the [P]hone" at any time.  **Denied.  Plaintiff testified that "it's not her phone.  So I wouldn't' say we really share the phone." *Id.* at 62:1-2; Ms. Charles has only used the phone infrequently. *Id.* at 22:21-24; 23:4-11; 34:17-19; 67:13-14.**

11. There was no specific schedule of days or times when Plaintiff was entitled to exclusive use of the Phone.  **Denied.  Plaintiff was always entitled to exclusive use of the phone.  Plaintiff paid for the phone and paid the bill for its use. *Id.* at 25:9, 25:18-19, 38:4-8, 48:16 – 49:4, 59:2-10, 61:5-21.**

12. Plaintiff sometimes received calls on the Phone from callers looking to speak with

Ms. Charles.  **Admitted only that Ms. Charles's mother and brother had called to speak with Ms. Charles, but denied that anyone else called the phone to speak with Ms. Charles. 70:2-4 ("just her mom and her brother.  Q. Anyone else?  A. No, not that I can think of.")**

13. Plaintiff does not know who else, other than Ms. Charles, may have used the Phone when it was with Ms. Charles. **Denied.  Other than Plaintiff, and the occasional use by Ms. Charles, nobody else uses the cell phone**. 19:24 – 20:2 ("Q. Does anyone else . . . use that cell phone?  A. No.")

14. At his deposition, Plaintiff described the Phone as follows: "[I]t's her dad's phone, the phone is in her dad's name . . ." **Denied that this accurately summarizes Plaintiff's deposition testimony.  Plaintiff repeatedly testified that it was his phone, he paid for the phone, and that he was the primary user.  *See Id.* at  37:18 – 38:1, 62:1-2, 36:1-5, 37:10-17, 42:1-4; 59:2-10, 61:5-21, 25:18-19.  The reference to the phone being in her Dad's name was made in the context of why Plaintiff spoke to his girlfriend about this case. *Id.* at 16:15-20.**

15. During the three-month period in which the calls at issue in this case allegedly occurred, there were times when the Phone was in the possession of Ms. Charles, and was not in Plaintiff's possession. **Denied.  Plaintiff said that he "can't say exactly when" she had the phone, but in in any case only had it for a day or two. 179:23–180:1; 67:13-14.**

16. Plaintiff does not know whether Ms. Charles "had the phone when they [Ally] called." **Denied. Plaintiff answered the calls from Ally, listened to voicemails from Ally, and repeatedly informed Ally that it was calling the wrong number. *Id.* at 71:25 – 72:4, 72:13-18, 74:18, 75:9-10, 72:23-24, 101:8-10.**

17. Ms. Charles told Plaintiff that, when she had the Phone, she sometimes would receive wrong number calls. **Admitted, but denied that Ms. Charles ever answered the phone when Ally called.** *Id.* **at 179:3-5.**

18. In his Complaint, Plaintiff falsely stated that he was the sole owner, and sole user, of the Phone. **Denied.   The Complaint states that "Plaintiff has been the user, and has exercised dominion and control of his cellular telephone number that received the subject calls which form the basis of this action."** *Doc. 1.* **This is true.**

19. Plaintiff repeated this false allegation in a subsequent, sworn response to Ally's interrogatories. **Denied.   Plaintiff's interrogatory is fundamentally and substantially accurate.   Plaintiff is the sole owner and the primary user of the number and pays for its use.** *Tillman Dep. Trans.* **at 37:18 – 38:1, 62:1-2, 36:1-5, 37:10-17, 42:1-4, 59:2-10, 61:5-21, 25:18-19.**

20. On or about the end of 2015 or the beginning of 2016, Plaintiff downloaded an application called Metro Block It ("Block It") to prevent receipt of calls. **Admitted.**

21. Plaintiff added Ally's number to the Block It application on January 30, 2016, after a call came in from Ally. **Admitted.**

22. According to Block It's advertisements, calls from blocked numbers are immediately disconnected and voicemails cannot be left. **Admitted that this is what some Metro Block It materials stated, but denied that the application actually "immediately disconnects" any calls or prevents voicemails.** *Tillman Dep. Trans.* **at 214:11-12, 76:18-20, 88:1-2, 107:18-22, 120:10-24, 122 :11-12, 122:18-20, 122:25 – 123:9, 155:3-5;** *First Orion Dep. Trans.* **at 22:3-4; 23:8, 23:15-18, 28:15-17, 48:10-11.**

23. Block It is designed to block calls by immediately disconnecting incoming calls from a user's block list. **Denied. Metro Block It does not immediately disconnect any calls; the calls are still received by the phone and still go to voicemail. *Tillman Dep. Trans.* at 214:11-12, 76:18-20, 88:1-2, 107:18-22, 120:10-24, 122 :11-12, 122:18-20, 122:25 – 123:9, 155:3-5; *First Orion Dep. Trans.* at 22:3-4; 23:8, 23:15-18, 28:15-17, 48:10-11.**

24. Block It successfully blocked calls from Ally to the Phone after Ally's phone number was added to the block list. **Denied that Block It prevented the connection of any of Ally's calls to Plaintiff's phone. Plaintiff still received the calls. *Tillman Dep. Trans.* at 214:11-12, 76:18-20, 88:1-2, 107:18-22, 120:10-24, 122 :11-12, 122:18-20, 122:25 – 123:9, 155:3-5; *First Orion Dep. Trans.* at 22:3-4; 23:8, 23:15-18, 28:15-17, 48:10-11.**

25. Block It's call blocking history for the Phone shows at least 7 calls from Ally were successfully blocked. **Denied that Block It prevented the connection of any of Ally's calls to Plaintiff's phone. Plaintiff still received the calls. *Tillman Dep. Trans.* at 214:11-12, 76:18-20, 88:1-2, 107:18-22, 120:10-24, 122 :11-12, 122:18-20, 122:25 – 123:9, 155:3-5; *First Orion Dep. Trans.* at 22:3-4; 23:8, 23:15-18, 28:15-17, 48:10-11.**

26. Any other calls from Ally not reflected in Block It's call blocking history did not require blocking because the Phone was either turned off or out of service. **Denied. There is no evidence that Plaintiff's phone was "turned off" or "out of service" when Ally called. First Orion merely testified that in order for the Block It app to work, the phone has to be in service and turned on. *First Orion Dep. Trans.* at 95:22-23 ("for the app to see the call, to take an action, the phone has to be powered on and in range of service.")**

27. Plaintiff identified twenty-two (22) alleged calls from Ally that are at issue (the

"Calls"). **Admitted that Plaintiff identified "*at least*" 22 calls from Ally based on the Block It call log covering January 20, 2016 through March 31, 2016.** *See Doc. 73-3 - Goldsmith Declaration* **at Ex. B thereto (Metro call log);** *Doc. 73-6 – id.* **at ex. E thereto (Answer to Interrogatory #7);** *Tillman Dep. Trans.* **at 144:1-6.  Ally's internal call records show that it placed numerous before and after that date range.** *Exhibit 1 - Collections History Summary.*

28. Plaintiff alleges that the 22 phone calls at issue were meant for an Ally customer named Phillip Everett, who is not a party to this case. **Admitted.**

29. The Account allowed unlimited use of the Phone for a fixed monthly cost. **Admitted.**

30. Plaintiff paid "like 20, 30 dollars" toward the monthly bills associated with the Account, while Ms. Charles paid the rest on her credit card.  **Denied that this accurately describes the payment arrangement for the phone account.  Plaintiff testified that he pays for the use of his line.** *Tillman Dep. Trans.* **at 25:9 ("I pay for that phone"); 25:16-25 ("she'll pay the first part, which is for the other line, and I pay what's left.")**

31. The Phone had a call-waiting feature. **Admitted.**

32. The Calls did not cause physical harm to Plaintiff. **Admitted.**

33. The Calls did not damage the Phone. **Denied.  The Calls depleted the battery.** *Tillman Dep. Trans.* **at 69:1-6.  The calls also occupied the storage in Plaintiff's voicemail. 74:18; 75:9-10.**

34. Plaintiff only needed to charge the Phone's battery "[l]ike once a day, or when I sleep." **Admitted.**

35. Plaintiff has not received, or sought out, any medical treatment as a result of any alleged stress caused by the Calls. **Admitted.**

36. In addition, Plaintiff noted that he has no specific personal recollection of a number of the calls at issue. **Admitted that Plaintiff does not recollect the details of every single call he received from Ally, but denied that Plaintiff does not recollect receiving numerous calls from Ally even after he repeatedly asked Ally to stop calling.** *Tillman Dep. Trans.* **at 71:25 – 72:4, 72:13-18, 75:9-10, 72:23-24, 101:8-10.**

### IV. Plaintiff has Statutory Standing as the Regular User of the Phone

The "regular user of the phone" has statutory standing to assert a cause of action under the TCPA, regardless of whether that persons is the "sole user" or "subscriber." *Manno v. Healthcare Revenue Recovery Group, LLC*, 289 F.R.D. 674, 683 (S.D. Fla. 2013) ("plaintiff's status . . . depends not on such technicalities as whether he or she is the account holder or the person in whose name the phone is registered, but on whether the plaintiff is the regular user of the phone.")

This conclusion "finds . . . support from the fact that the TCPA is designed to protect <u>users</u> of telephones from nuisance calls and from unwarranted invasions of their privacy. *Soullier v. Cent. Fla. Invs., Inc.*, 2015 U.S. Dist. LEXIS 36858, *12 (M.D. Fla. 2015) (original emphasis) (citing Pub.L. 102—243, § 2, ¶¶ 12-14, 105 Stat. 2394 (1991) (banning automated or prerecorded telephone calls is the only effective means of protecting telephone consumers from 'this nuance and invasion of privacy'; automated or prerecorded telephone calls 'are a nuisance, are an invasion of privacy'")).

Thus, "several district courts within the Eleventh Circuit . . . have held that the primary or regular user of the cell phone has standing." *Id.* at \*11-12; *see also Page v. Regions Bank*, 917 F.Supp. 2d 1214, 1219 (N.D. Ala. 2012) ("Page is the regular user and carrier of the cellular telephone, as well as the person who needs the telephone line to receive other calls. The fact that the telephone number was registered in Page's fiancee's name does not change this result."); *Fini v. Dish Network*, 955 F.Supp.2d 1288, 1296 (M.D. Fla. 2013) ("this Court finds that Plaintiff has standing because she is the regular user and carrier of the phone at issue in this case."); *Cellco P'ship v. Plaza Resorts, Inc.*, 2013 U.S. Dist. LEXIS 139337, \*14-15 (S.D. Fla. 2013) (ruling that "primary user of the telephone" has statutory standing to assert a cause of action under the TCPA). Thus, it does not matter that Plaintiff's girlfriend's father is the account holder for the MetroPCS plan or that Plaintiff's girlfriend occasionally used the phone; Plaintiff has statutory standing as the regular user of the phone that Ally called.

Ally cites to *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1214 (11ᵗʰ Cir. 2014) for the proposition that only the "subscriber" to a telephone number has statutory standing to bring a TCPA claim. *Motion* at p. 10. But that is not what *Osorio* holds at all. *Osorio* did not even address the issue of statutory standing, but instead considered *whose consent* a robocaller could rely on as a defense to a TCPA claim. *Id.* at 1250 (addressing "prior express consent of the called party"). *Osorio* rejected the idea that consent of the "intended recipient" of a call (in this case, the unknown third party Phillip Everett from whom Ally was seeking to collect a debt) was sufficient consent under the TCPA. *Id.* at 1252. It held instead that only the "subscriber" can consent, but it defined the term subscriber as "the person who pays the bills **or** needs the line in order to receive other calls." *Id.* at 1251 (emphasis added) (citing *Soppet*

*v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640 (7th Cir. 2012)). Under *Osorio*'s definition, Plaintiff is the "subscriber" because, as the regular user of the phone, he was the one that "needs the line in order to receive other calls." *Id.*

Ally also cites to *Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265 (11th Cir. 2014) as setting a "primary user" standard that requires "exclusive use" of a phone. *Motion* at p.11. *Breslow*, of course, does no such thing, as the mere proposition is a contradiction in terms. Like *Osorio*, all *Breslow* holds is that a robocaller cannot rely upon consent of the "intended recipient" of a call. *Id.* at 1267. It does not address statutory standing at all. The one use of the term "primary user," which Ally twists beyond recognition, is a mere recitation of facts:

> "Although Breslow was the named account holder for the cell phone number, she was not the primary user of the phone. The cell phone was used exclusively by her minor child, 'R.B.'"

*Id.* at 1266. Thus, Breslow does not holder that one must have "exclusive use" of a phone in order to be a "primary user"; if anything, all this language suggests is the obvious point that one cannot be a "primary user" if *somebody else* has exclusive use of a phone. In this case, Plaintiff was the primary user of the phone. Nobody else had exclusive, or even substantial use of the phone. Plaintiff therefore has statutory standing to assert his claim. Under Ally's argument, anybody that lets a girlfriend, spouse, child or any third party use their phone would not have statutory standing to sue under the TCPA. This is nonsense as virtually no one would have standing -it is very common for persons to occasionally use someone else's cellular phone. This does not change the fact that the regular and primary user of the phone has a claim under the TCPA for the calls placed to his or her number.

## V. Plaintiff (Still) Has Article III Standing

When this Court denied Ally's Motion to Dismiss, it rejected Ally's argument that its violation of the TCPA was insufficient to confer Article III standing:

> "The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'" *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.2 (1973)). Here, the TCPA is a consumer protection statute in which Congress conferred upon all consumers the right to be free from unwanted autodialed calls. Thus, the Court finds that based upon the allegations that plaintiff received unsolicited ATDP telephone communications which intruded upon his seclusion, plaintiff has alleged a particularized and concrete injury sufficient to confer Article III standing."

Doc. 58 at p. 9. Plaintiff establishes above that he did, in fact, receive Ally's calls both before and after he installed the Block It application. *SOAMF* at ¶¶ 15-22. Plaintiff also establishes above that he suffered monetary injury as a result of Ally's calls, as they drove Plaintiff to pay for a call blocking application in the hopes that Ally's calls would cease. *Id.* at ¶14. In addition, these calls were such a nuisance and waste of Plaintiff's time that he went through the trouble of installing the application after Ally refused to stop calling after repeated requests to do so. *SOAMF* at ¶¶13-14, 17-18. These injuries too are sufficient to satisfy standing. *See Patriotic Veterans v. Zoeller*, 2017 U.S. App. LEXIS 47, *5-6 (7th Cir. 2017) ("Every call uses some of the phone owner's time and mental energy, both of which are precious.")   There is therefore no basis to revisit this ruling.

Further, the Court's ruling is in line with recent authority from the Ninth Circuit establishing that "a violation of the TCPA is a concrete, de facto injury" sufficient to confer Article III standing. *Van Patten v. Vertical Fitness Group, LLC*, 2017 U.S. App. LEXIS 1591, *9-10 (9th Cir. January 30, 2017).   Thus, "[a] plaintiff alleging a violation under the TCPA need not allege any additional harm beyond the one Congress has identified." *Id.* In light of

the Ninth Circuit's ruling, Ally's repeated citation to *Romero v. Dept. Stores Nat'l Bank*, 2016 U.S. Dist. LEXIS 110889 (S.D. Cal. 2016) are unavailing. *Van Patten* plainly overrules and rejects *Romero*'s reasoning, as does the Eleventh Circuit's *Palm Beach* decision. *See infra*; s*ee also Glasser v. Hilton Grand Vacations Co., LLC*, 2017 U.S. Dist. LEXIS 381, *4 (M.D. Fla. 2017) (ruling that Romero is unpersuasive in light of *Palm Beach*).

Defendant nevertheless seeks reconsideration of the same arguments it made in its Motion to Dismiss, contending that Plaintiff must separately and independently establish standing for every single phone call that Ally made. The Court already rejected this argument:

> "Defendant also argues that plaintiff must demonstrate he possesses standing for each separate call and that plaintiff cannot recover for all calls absent a showing that each call caused meaningful harm. (Doc. #29, pp. 2, 9-10.) As the Court has discussed, plaintiff has standing to proceed based upon the allegations that he received autodialed calls. Any arguments concerning whether plaintiff and consumers were harmed by calls they did not receive or notice is more appropriately addressed at the class certification stage."

Doc. 58 at p. 10. Rather than adhere to the Court's ruling, Ally has reiterated the same argument that Plaintiff has no standing in a motion for summary judgment.

Plaintiff need not separately establish standing for each and every one of the robocalls that he received from Defendant. Although the Supreme Court has held that "a plaintiff must demonstrate standing for each *claim* he seeks to press" (*Davis v. FEC*, 554 U.S. 724, 734 (2008) (emphasis added), the court's concern was that standing to assert a claim under one statutory provision was not *per se* sufficient to assert standing under a *separate* statutory provision. *Id.* at 733-34 ("The fact that Davis has standing to challenge § 319(*b*) does not necessarily mean that he also has standing to challenge the scheme of contribution limitations that applies when § 319(*a*) comes into play.") (emphasis added). In this case, on the other

16

hand, Plaintiff asserts a single claim on behalf of the class that Defendant illegally used automated telephone equipment in violation of a single statutory provision – 47 U.S.C. § 227(b)(1)(A)(iii). *Doc. 1 - Complaint* at ¶ 13, *id.* at p. 6 (asserting a single Count (Count I) in this action). The fact that Plaintiff received 45 calls at various times does not transform this action into 45 separate claims, because they all result from the same conduct undertaken in violation of the same statutory provision. *See Bowen v. First Family Fin. Servs.*, 233 F.3d 1331, 1339 (11ᵗʰ Cir. 2000) ("standing is gauged by the specific common-law, statutory or constitutional claims that a party presents.")

Per the TCPA's private right of action provision, Plaintiff is entitled "to receive $500 in damages for each such violation" (47 U.S.C. 227(b)(3)(B)), but whether or not Plaintiff can recover those damages, and the amount of damages, for each of the calls is a merits question that Ally does not address, not a jurisdictional question, which is the focus of Ally's standing argument. S*ee Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998) ("There is a "fundamental distinction between arguing no cause of action and arguing not Article III redressability" because "the former argument is not squarely directed at jurisdiction itself, but rather at the existence of a remedy for the alleged violation of federal rights[.]"); *Sierra Club v. United States*, 774 F.3d 383, 389 (7th Cir. 2014) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."), citing *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).

In any case, Plaintiff *has established* a concrete injury in fact for each one of the calls at issue. The Eleventh Circuit's ruling in *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris,*

17

*D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015) is dispositive on this issue. In that case, the defendant argued that the plaintiff did not have Article III standing to assert a TCPA claim for illegal fax transmissions because the plaintiff "failed to prove that the fax was printed or seen." *Id.* at 1250. The court rejected that argument and held that there was a sufficient injury-in-fact because "the fax information was successfully transmitted by B2B's fax machine and … the transmission occupied the telephone line and fax machine of Palm Beach Golf during that time." *Id.* at 1252 ("This occupation of Plaintiff's fax machine is among the injuries intended to be prevented by the statute and is sufficiently personal or particularized to Palm Beach Golf as to provide standing.") Thus, under binding Eleventh Circuit authority, it doesn't matter if a plaintiff was ever aware of an allegedly illegal call under the TCPA – Article III standing arises from the call itself because it occupies the telephone line and device, like a trespass to chattels. Defendant's continued failure to even mention *Palm Beach* is baffling.

Defendant's attempts to avoid *Palm Beach* have no merit. First, Ally's contention the Plaintiff lacks standing for calls that he "did not hear" or answer is expressly rejected by *Palm Beach*. It does not matter if Plaintiff was "aware" of the calls, they occupied his telephone line and device all the same. *Id.* Thus, Ally's contention that "nothing in the law or logic suggest that a person can be harmed by a call he was never even aware of" is wrong. *Motion* at p. 20. That is the holding of *Palm Beach*. *See Glasser*, 2017 U.S. Dist. LEXIS 381 at *5 (ruling that "it is unnecessary for Plaintiff to allege that she answered the calls") (*citing Palm Beach*, 781 F.3d at 1251).

Second, there is no evidence that Plaintiff's girlfriend happened to possess or answer the phone during one of Ally's calls. It is beyond a stretch to argue that the fact that she had

used the phone a few of times in the past means she answered the calls at issue.  Yet, even making this assumption, Plaintiff would still have suffered the same concrete injury in fact for such a call because the call occupied *his* cellular telephone, which he paid for and for which he pays the bill. *SOAMF* at ¶¶ 1-3; *Palm Beach,* 781 F.3d at 1252 ("This occupation of Plaintiff's fax machine is among the injuries intended to be prevented by the statute and is sufficiently personal or particularized to Palm Beach Golf as to provide standing.")  Further, as the regular and primary user of the phone, Plaintiff, not Plaintiff's girlfriend, has statutory standing to assert that such calls violate the TCPA. *See Supra.*

Third, Ally's contention that Plaintiff does not have any injury for calls that were "blocked" by the Metro Block It application is disproved by the facts.  The Metro Block It application does not and cannot prevent calls from connecting to a cell phone; even calls that are "blocked" are still received by the phone. *See SOAMF* at ¶¶ 19-22.  Thus, the *Palm Beach* decision is still on point for all such calls – each call connected to his phone, regardless of whether it was subsequently "blocked" after connection.  As First Orion testified in its deposition, when a so-called block occurs, the phone still receives the call – it lights up, it rings, and it provides a blocking notification *after* the call is received. *Id.* at ¶¶ 19-20.  Further, the version of that app that Plaintiff used did not even have the ability to block calls at all – all it did was transfer the calls to voicemail.  *Id.* at ¶ 21 ("the best we can do is send the call to voice mail."), ("All blocked calls are sent to voice mail").  Thus, Plaintiff repeatedly testified that the Metro Block It Application did not block any of Ally's calls. *Id.* at ¶ 22 ("when I tried to block the number, that number kept coming in, so I blocked it again. Somehow they were just coming in."), ("it lets them call still.")  Further, Plaintiff still has to waste his time to

19

retrieve the voice-mails or view who was calling in any case. As much as Ally might like to use Plaintiff's attempt to stop the calls against him, his use of the Metro Block It application does not deprive him of Article III standing.

### VI. Conclusion

Ally's Motion for Summary Judgment should be denied.

Respectfully submitted this 7th day of February, 2017.
s/ Timothy J. Sostrin
Timothy J. Sostrin (*pro hac vice*)
Keith Keogh
KEOGH LAW, LTD
55 W. Monroe St, Suite 3390
Chicago, IL 60603
312-726-1092
312-726-1093 (fax)
TSostrin@KeoghLaw.com

William Peerce Howard (FBN 0103330)
Amanda J. Allen (FBN 098288)
THE CONSUMER PROTECTION FIRM
TheConsumerProtectionFirm.com
210 A-South MacDill Ave.
Tampa, Florida 33609
Telephone: (813) 500-1500
Billy@TheConsumerProtectionFirm.com
Amanda@TheConsumerProtectionFirm.com
Attorneys for Plaintiff
DONELL TILLMAN

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 7, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, who will send a notice of electronic filing to all counsel of record.

By: /s/ Timothy J. Sostrin
Timothy J. Sostrin
Counsel for Plaintiff