FILED

**UNITED STATES DISTRICT COURT** JAN 10   AM 11: 41
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**  CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

Donell L. Tillman, individually and on behalf of
all others similarly situated

        Plaintiff,                    CASE NO. 2:16-cv-00313-UA-CM

    v.

Ally Financial Inc.,

        Defendant.

_____/

## ALLY FINANCIAL INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

    (This opposition and several documents filed in support thereof have been

electronically filed in redacted form pending the Court's ruling on Ally's Unopposed Motion

to Seal.  Ally has also filed a motion seeking leave to file up to 40 pages for its opposition

brief (Doc. 127).  If the Court denies Ally's request, Ally respectfully requests up to five

days to submit a shortened brief.)

## I. INTRODUCTION

Plaintiff's *corrected* Motion for Class Certification (Doc. 119) ("Certification Motion") asks the Court to certify vague, unpleaded, and unascertainable classes that the class representative, Donell L. Tillman ("Plaintiff"), lacks standing to represent. Even if the classes were properly defined, pleaded, and represented (which they are not), at trial, the circumstances surrounding each call to each class member would need to be examined—including the meaning behind the undefined terms "do not call" and "wrong number" appearing in Ally's records—on a file by file (indeed, call by call) basis, to determine which calls, if any, violated the TCPA and injured the would-be class member. Individualized issues of proof swarm what few common issues there may be between class members.

This is hardly a surprising result. Despite Plaintiff's misdirected attempt to a create a contrary impression, the rule is that multi-source[1] TCPA cases are not certifiable due to a lack of commonality and the predominance of individual issues on the issue of consent. *Gene & Gene L.L.C. v. BioPay L.L.C.,* 541 F.3d 318, 326-29 (5th Cir. 2008). In such cases, certification must inevitably be denied since consent is necessarily an individualized issue. *See Shamblin v. Obama for Am.*, No. 13-2428, 2015 WL 1909765, at *7 (M.D. Fla. Apr. 27, 2015) ("[T]here can never be common answers to the question[] of whether... the subscriber consented to be called... [t]here is no 'classwide' proof on these outcome-determinative issues."). Indeed, it has twice been squarely held that TCPA class cases brought in the debt

---

[1] That is, cases—such as this one—where the phone numbers come from many different sources, some consented and some potentially non-consented. *See Selby v. LVNV Funding, LLC*, No. 13-cv-01383-BAS(BLM), 2016 U.S. Dist. LEXIS 83940, at *34-35 (S.D. Cal. June 22, 2016) (TCPA cases not certifiable where there are multiple sources of phone numbers).

collection context cannot be certified for that very reason. *See Stein v. Monterey Fin. Servs.*, No. 2:13-cv-01336-AKK, 2017 U.S. Dist. LEXIS 12707, at *16 (N.D. Ala. Jan. 31, 2017); *Selby*, 2016 U.S. Dist. LEXIS 83940, at *34-35.

Plaintiff's evidence—what little of it there is—highlights these issues. The policy he attaches to the Certification Motion plainly demonstrates that Ally's agents stop calling when a third-party reports a "wrong number" was called. But, the policy also demonstrates that not every "wrong number" report from a call recipient will be reliable. Some will be erroneous reports. Agents are tasked with sifting out who is who by asking a series of questions. Plainly, therefore, identifying who among those reporting a "wrong number" are, in fact, receiving a call intended for someone else requires an individualized factual showing. *See, e.g., Davis v. AT&T Corp.*, No. 15cv2342-DMS (DHB), 2017 U.S. Dist. LEXIS 46611, at *13-16 (S.D. Cal. Mar. 28, 2017) (denying class certification based upon "wrong number" notations because not all "wrong number" reports mean a number has changed hands).

The "Do Not Call" component is worse yet. Plaintiff introduces no evidence regarding Ally's policies for handling "do not call" requests at all. Further, revocation classes—which turn on fact-specific requests for calls to stop under varying circumstances—are commonly struck at the pleading stage as they are patently uncertifiable. *See, e.g., Cholly v. Uptain Grp., Inc.*, No. 15 C 5030, 2017 U.S. Dist. LEXIS 14449, at *11 (N.D. Ill. Feb. 1, 2017) (striking revocation class because "individual inquiries necessary to determine class membership will 'inevitably predominate' over any common questions of fact").

Although the Certification Motion must be denied for myriad additional reasons as well—the lack of an administratively feasible way to identify class members, a large

percentage of class members that have waived their right to participate in the class, a class representative who is atypical in the extreme—the lack of commonality really should be the beginning and end of the analysis. No amount of further discovery could change this result. As such, the Certification Motion must be denied.

## II. ALLY'S TCPA COMPLIANCE EFFORTS

Plaintiff's Certification Motion is predicated on a central false premise—that Ally has a "common practice of using prohibited technology to place debt collection robocalls to cellular telephone numbers even after noting in its own records that the people using those numbers did not consent to be called." Certification Motion, p. 14. Ally will demonstrate that Plaintiff's assertion is patently incorrect. In reality, no such "common practice" exists and Ally's policies are designed to assure TCPA compliance.

**A.    Ally Obtains Consent Before Calling Customers Using Regulated Technology**

Ally's TCPA policies are simple and effective. Before Ally leverages any automated dialing systems to attempt a call to a customer it first assures that it has that customer's express consent to call. Declaration of Diane Accurso ("Accurso Dec."), ¶¶ 7-17. Consent is most often obtained at the time of application. Ally's application materials request that customers provide their phone numbers and the vast majority of customers do so. *Id.*, ¶ 8. These applications contain cell phone consent disclosures, as do most of the credit agreements Ally purchases. *Id.*; Declaration of Sandra Hampton ("Hampton Dec."), ¶¶ 3-5. For instance, the relevant application underlying Ally's calls in this case provides:

> By providing your cell phone number on this application you are consenting to receive servicing and collection calls on your cell phone using an auto dialer or a prerecorded message.

Accurso Dec., ¶ 8.

In setting up an account, Ally's agents or system review each application to assure that a consent disclosure exists within the agreement. *Id.*, ¶ 11-12. If so, the phone number provided on the application is entered in Ally's CARS system (Ally's customer account management system), noted as "C" to permit the use of automated technology to contact the number. *Id.* If not, then the number is coded as a "P" and no automated calls are attempted unless and until express consent is obtained from the customer. *Id.* Consent may also be obtained when a customer provides a phone number to an Ally agent during a live contact. *Id.*, ¶ 13. In those circumstances Ally's agents are trained to read a script asking the customer whether Ally may contact that number using automated technology. *Id.* Only if the response is a clear "yes" may the agent code the number as consented. *Id.*, ¶¶ 13-14. And only if the number is coded as consented will Ally contact that number using automated technology. *Id.*, ¶¶ 11, 16, 17, 20, 23; Declaration of Aaron Heiner ("Heiner Dec."), ¶¶ 5-6.

**B.    Heeding "Do Not Call" Requests**

Occasionally a call recipient will advise that he or she no longer wishes to receive calls. In that instance, agents are to update the phone number "status code" field in SHAW (Ally's customer collections system), which writes to CARS and changes the phone number to suppress further dialer calls. Accurso Dec., ¶ 6. In the instance of an oral "do not call" report by a call recipient, the agent enters an "x" in the status code update field in SHAW. *Id.*, ¶ 23. This entry automatically edits the cell phone number in the CARS system (the two systems "talk" to each other) to replace the first digit of the number with an "x." *Id.* The entry of an "x" code necessarily prevents any further dialing to that number—the dialer

cannot attempt a call to a letter. *Id.*

Agents are also directed to update the permission code in CARS to an "N" which will also cease further dialer calls to the number. Ally's policy is clear this must be done "immediately." It states:

> **"CONSENT REVOKED, WITHDRAWN, OR RETRACTED**
> If a customer gives permission and later revokes, withdraws, or retracts consent, **immediately** change the permission code to N; all calls to the customer's cell phone **MUST** cease. *Id.*, ¶ 24, Ex. C, p. 6. (emphasis in original).

Importantly, however, calls to a number previously marked as an "x" may continue if the customer re-consents to receive calls on that number. *Id.*, ¶¶ 29, 34. This is a very common occurrence. *Id.*, ¶ 34; Declaration of Stephen Johnson ("Johnson Dec."), ¶ 11; Declaration of Shada Hall ("Hall Dec."), ¶ 8; Declaration of Jordan McClure ("McClure Dec."), ¶ 8.

## C.    Avoiding Calls to Wrong Numbers

Ally affirmatively seeks information to validate the accuracy of its phone numbers during every phone call. Accurso Dec., fn. 1. Nonetheless, calls to wrong numbers sometimes occur as a customer's phone may change hands without Ally's knowledge. That is what happened with respect to the cell phone at issue in this case. Accurso Dec., ¶ 28.

Unfortunately, "wrong number" reports are not very reliable in the debt collection context. Accurso Dec., ¶¶ 25-28. Sometimes the delinquent customer pretends to be a third party in order to procrastinate or avoid paying sums owed. *Id.*, ¶ 27; Johnson Dec., ¶ 3; Hall Dec., ¶ 3; McClure Dec., ¶ 3; Declaration of Scott Goldsmith ("Goldsmith Dec."), Ex. A, Report of Ken Sponsler ("Sponsler Report"), ¶ 12. Sometimes a third party uses the phrase

"wrong number" merely as a shorthand way of explaining that the customer is not available at that time, although the number is perfectly valid.  Accurso Dec., ¶ 28; Johnson Dec., ¶ 3; Hall Dec., ¶ 4; McClure Dec., ¶ 4.

Ally has developed a policy of attempting to discern whether a number is actually invalid when a call recipient reports a "wrong number."  Specifically, as Exhibit 1 to the Certification Motion demonstrates, Ally's agents can treat a number as valid following a "wrong number" report if: i) the number is correct but the customer is not available at the number; ii) the person knows the customer and says the customer can be reached at the number; or iii) the person can provide location information on the customer and indicates calls may continue. *See also*, Johnson Dec., ¶ 4.  In these instances, the number is not really a "wrong number" or recycled cell phone.  Instead, the number called was the preferred number at which the customer desired to be reached, but the customer was simply unavailable at that time.

If, however, the number cannot be validated, then the agent must treat the number as invalid and assure that the number is not dialed again.  Johnson Dec., ¶ 5; McClure Dec., ¶ 6; Hall Dec., ¶ 6.  In that instance, the agent must enter a "w" in the status code update field in SHAW.  *Id*.  This entry automatically edits the cell phone number in the CARS system to replace the first digit of the number with a "w."  Accurso Dec., ¶¶ 6, 20; Heiner Dec., ¶¶ 5-6.  The entry of a "w" code necessarily prevents any further dialing to that number—the dialer cannot attempt a call to a letter.  *Id*.

**D.     Ally's Agents Enter Free Form Notes Even Where a Number Remains Valid**

Agents are required to document the outcome of all calls in SHAW, by typing free

form text notes into the system, regardless of whether or not a number remains valid. *See, e.g.,* McClure Dec., ¶ 5; Johnson Dec., ¶ 6. Indeed, the vast majority of SHAW notes will have nothing to do with an invalid phone number. Agents are free, however, to use their own language in entering those notes. *See* McClure Dec., ¶ 5; Hall Dec., ¶ 5. As such, an agent may enter a phrase, such as "do not call" or "wrong number" in such a free form note for myriad reasons that have nothing to do with the validity of a phone number. *See., e.g.,* Accurso Dec., ¶¶ 26-27; 30, 32-33; Johnson Dec., ¶¶ 5-10; Hall Dec., ¶ 4; McClure Dec., ¶ 4; Sponsler Report, ¶¶ 11(j), 12.

For instance, with respect to a "do not call" notation, the agent might be notating a request that the customer not be called at a certain time, or on certain days, or for a certain period of time, or regarding a certain payment deficiency. Johnson Dec., ¶ 8; Hall Dec., ¶ 4; McClure Dec., ¶ 4. The note may refer to a different number than the number called. Johnson Dec., ¶¶ 8-9; Hall Dec., ¶ 4; McClure Dec., ¶ 4. It may be a request that Ally not call at work, or not call references, or not call a landline. Johnson Dec., ¶¶ 8-9; Hall Dec., ¶ 4; McClure Dec., ¶ 4. Similarly, a note advising that the customer's landline phone is a "wrong number" would mean that the customer's cell phone is actually the *only* valid method to reach the customer.[2] Johnson Dec., ¶ 5. Further, the phrase "wrong number" may refer to account numbers, addresses, or any other personal identifying information that may have been corrected by a customer during a phone call. Accurso Dec., ¶ 26; Johnson Dec., ¶ 6;

---

[2] Ally's policy is to confirm and update customer information during each call. It is therefore common for customers with multiple numbers to update one phone number but not the other, particularly residential land lines that may change when a customer moves; whereas, the cell phone number may not change. Johnson Dec., fn. 1.

Hall Dec., ¶ 4; McClure Dec., ¶ 4.  These circumstances occur all the time.  *See, e.g.,* Johnson Dec., ¶¶ 5-6; Hall Dec., ¶ 4; McClure Dec., ¶ 4; Sponsler Report, ¶ 11(j).

## III. CERTIFICATION MUST BE DENIED AS PLAINTIFF SEEKS TO CERTIFY AN UNPLEADED AND VAGUE CLASS HE LACKS STANDING TO REPRESENT

The Certification Motion never even makes it out of the starting blocks.  First, the Certification Motion focuses solely on a new class and subclass that are not alleged in the Complaint.  *Compare* Certification Motion p. 4, *and* Compl., ¶ 39.[3]  On this basis alone the Certification Motion must be denied.  *See Davis*, 2017 U.S. Dist. LEXIS 46611, at *4-11 (substituting one class for another at the certification stage is impermissible and grounds to deny certification); *Thompson v. State Farm Fire & Cas. Co.*, No. 5:14-CV-32 (MTT), 2016 U.S. Dist. LEXIS 30308, at *9-10, 39-41 (M.D. Ga. Mar. 9, 2016) (*sua sponte* refusing to allow subdivision of classes not contained in original complaint); *Clarke v. Baptist Mem. Healthcare Corp.*, 264 F.R.D. 375, 381 (W.D. Tenn. 2009) ("To accommodate a new proposed class definition, Plaintiffs will need to amend the complaint[.]"); *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) ("The Court is bound to class definitions provided and, absent an amended complaint, will not consider certification beyond it.").[4]

It is true that some courts allow a class representative to "move the ball" at the certification stage.  *See Davis*, 2017 U.S. Dist. LEXIS 46611, at *4-5 (noting split of

---

[3] The Court should "presume[] that this redefinition reflects, in part, Plaintiff['s] recognition that the Class[es] as constructed in the Complaint in fact suffer[] from some or all of the defects alleged by" Ally.  *See Bell v. Cheswick Generating Station, Genon Power Midwest, L.P.*, No. CIV.A. 12-929, 2015 WL 401443, at *5 (W.D. Pa. Jan. 28, 2015).

[4] Plaintiff's Certification Motion falsely states that the Court has already ruled that Plaintiff may modify his class definitions at the class-certification stage.  Certification Motion, p. 4, n. 2, citing Doc. 58.  But Plaintiff is misstating the Court's order.  The Court reserved the issue of Plaintiff's failsafe class definitions for the "class certification stage," but did not opine on Plaintiff's ability to change his definitions.  *See* Doc. 58, pp. 12-13.

approach among district courts). But the Court should not do so here. Ally has been laboring under the impression that one set of class members was at issue—utilizing totally different criteria to define the class—and now it is expected to adjust on the fly to a new class definition. The proper course to avoid such unfairness is for Plaintiff to have first sought leave to amend his pleadings to assert a class that the Plaintiff can actually represent—as Ally's counsel repeatedly urged Class Counsel to do for months. *See, e.g.,* Doc. 104-2 (email to Plaintiff's counsel asking that Plaintiff "re-plead classes that Mr. Tillman is a part of before seeking to undertake any further class discovery"). With the deadline to amend the pleadings having long-since passed, however, the amendment ship has sailed. *See* Doc. 54, p. 1 (Plaintiff's deadline to amend the pleadings was **November 18, 2016**), p. 4 (noting extensions of deadlines are disfavored).

Even if the new class and subclass were properly before the Court, however, Plaintiff's new classes are impermissibly vague. *See Kelecseny v. Chevron, U.S.A., Inc.,* 262 F.R.D. 660, 668 (S.D. Fla. 2009) ("[A] vague class definition portends significant manageability problems for the court." ) (quoting *Rink v. Cheminova, Inc.,* 203 F.R.D. 648, 660 (M.D. Fla. 2001)); *see also Fisher v. Ciba Specialty Chems. Corp.,* 238 F.R.D. 273, 301 (S.D. Ala. 2006) (a clear class definition is necessary so that class members know who is in the class) (*citing Turner v. Murphy Oil USA, Inc.,* 234 F.R.D. 597, 611 (E.D. La. 2006)).

For instance, it appears that class membership turns on the ownership of the cell phone numbers called. *See* Certification Motion, p. 4 (primary class and subclass include "[a]ll persons in the United States to whose cellular telephone number Ally placed at least two telephone calls..."). But Plaintiff does not own the cell phone number at issue ("Cell

Phone"). *See* Doc.73-2, at 16:17-18; 17:1-7; 24:19-22. So Plaintiff is not a member of the newly proposed class and cannot represent it.[5] It is possible, however, that what Plaintiff means—but does not say—is that he hopes to represent a class of persons "who received a call on a cell phone they were using." That definition, however, would fail for want of any way to identify the "users" of cellular telephone numbers, as opposed to their subscribers. *See Haight*, 2015 U.S. Dist. LEXIS 107010, at *11 (explaining why members of a class defined based upon the "receipt" of phone calls are necessarily unascertainable). The vagueness of the definition, however, thwarts a proper analysis of the Rule 23 factors.

The remainder of the definition is also problematic. For instance, the phrase "where Ally noted the number as Wrong Number or Do Not Call in its records" is subject to at least two readings. One possibility is that the class turns on numbers "noted" as a "wrong number" or "do not call" when a "w" or "x" is entered by an Ally agent or vendor in CARS pertaining to that number. That would be consistent with Ally's understanding. Accurso Dec., ¶¶ 25, 29. The second possibility is that the class turns on the mere appearance of free form text of some kind within the SHAW system.[6] If the former, Plaintiff cannot represent portions of the class or subclass because the Cell Phone was never coded with a "w" notation in CARS and Plaintiff was never called after an "x" notation was inserted in CARS. Accurso

---

[5] *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 360 (3d Cir. 2013) ("It is axiomatic that the lead plaintiff must fit the class definition"); *Johnson v. Am. Credit Co. of Ga.*, 581 F.2d 526, 532 (5th Cir. 1978) ("A fundamental requirement is that the representative plaintiff must be a member of the class...").

[6] Notably, Plaintiff does not define what text qualifies as a "wrong number" or "do not call" report, so it is impossible to know what language may qualify.

Dec., ¶¶ 25, 33.[7] If the latter, however, Plaintiff may have standing to represent individuals with free form "wrong #" text appearing in SHAW, but would not be able to represent the portion of the subclass pertaining to free form "do not call" notes since, again, Plaintiff was not called after the entry of that note. Accurso Dec., ¶ 33.

Finally, it must not be forgotten that Plaintiff has failed to introduce evidence that he received a "pre-recorded or artificial voice" call at all.  Once more, therefore, he cannot represent the portion of the class that received only such calls.

## IV. CERTIFICATION MUST BE DENIED AS PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF DEMONSTRATING RULE 23 IS SATISFIED

"The class action is `an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01, 99 S. Ct. 2545 (1979)). "A party seeking class certification must affirmatively demonstrate compliance with [Federal Rule of Civil Procedure 23][,]" (*Id.* at 2551) and "[a] district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (citations and internal quotation marks omitted). "Although the trial court should not determine the merits of plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003).

---

[7] *See Toback v. GNC Holdings, Inc.*, No. 13-80526-CIV, 2013 WL 5206103, at *4 (S.D. Fla. Sept. 13, 2013) (standing of a named plaintiff must be established on a claim-by-claim basis within the Eleventh Circuit) (citing *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000).

"For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in [Rule 23(a)], as well as at least one of the requirements set forth in Rule 23(b)." *Vega*, 564 F.3d at 1265. In addition, "[a] plaintiff seeking certification of a claim for class treatment must propose an adequately defined class that satisfies the requirements of Rule 23." *Abby v. Paige*, 282 F.R.D. 576, 578 (S.D. Fla. 2012) (citing *Kelecseny v. Chevron, USA., Inc.*, 262 F.R.D. 660, 667 (S.D. Fla. 2009)). "The burden of proof to establish the propriety of class certification rests with the advocate of the class." *Valley Drug Co.*, 350 F.3d at 1187.

## A.   Plaintiff's Failure to Demonstrate a Theory of Generalized Proof to Address Class Member Consent Dooms His Class

TCPA cases are not certifiable unless Plaintiff can demonstrate that consent to the calls at issue is subject to common proof for all class members. *Gene and Gene LLC*, 541 F.3d at 328 ("[D]istrict courts must only certify class actions filed under the TCPA when such a theory has been advanced."). Indeed, where a Plaintiff fails to demonstrate common proof on the issue of consent the case is *per se* uncertifiable. *Id.* at 329 (failing to "advance any viable theory employing generalized proof concerning the lack of consent" leads to the conclusion that "myriad mini-trials cannot be avoided; and that, given these conclusions and those we have reached above, the district court abused its discretion in certifying the class").

Following *Gene and Gene*, TCPA certification decisions generally fall into two categories. Those where the class member's phone numbers stem from a single source (*e.g.*, a telemarketing lead list) and those where the class member's phone numbers are provided from multiple sources and under different circumstances suggesting that class members are

not in the same positions *vis-a-vis* consent. The former category of cases may be certified.[8]

The latter category of cases, however, may not be. *See, e.g., Davis,* 2017 U.S. Dist. LEXIS 46611, at \*13-16; *Stein v. Monterey Fin. Servs.,* No. 2:13-cv-01336-AKK, 2017 U.S. Dist. LEXIS 12707, at \*16 (N.D. Ala. Jan. 31, 2017); *Ung v. Universal Acceptance Corp.,* No. 15-127 (RHK/FLN), 2017 U.S. Dist. LEXIS 10078, at \*8 (D. Minn. Jan. 24, 2017); *Espejo v. Santander Consumer USA, Inc.,* No. 11 C 8987, 2016 U.S. Dist. LEXIS 142259, at \*30 (N.D. Ill. Oct. 14, 2016) (assessing meritorious claims "would invariably lead to individualized factual disputes regarding whether consent was [] previously obtained...[because Plaintiff] cannot prevent Santander from asserting consent even in the face of records that do not reflect' consent); *Newhart v. Quicken Loans Inc.,* No. 9:15-CV-81250, 2016 U.S. Dist. LEXIS 168721, at \*14 (S.D. Fla. Oct. 12, 2016) ("[T]his Court thus joins the chorus of other courts faced with TCPA class actions that have found such individualized inquiries on the consent issue would predominate over any common issues."); *Selby,* 2016 U.S. Dist. LEXIS 83940, at \*34-35 ("an individual review of loan documents and other files related to the underlying debt obligation" would be required to determine whether "each individual gave express consent"); *Shamblin,* 2015 U.S. Dist. LEXIS 54849, at \*17-18; *Blair v. CBE Grp., Inc.,* 309 F.R.D. 621, 630 (S.D. Cal. 2015) ("[D]etermining whether a particular class

---

[8] *E.g. Madrigal v. C-Two Group, Inc., et. al,* 2015 WL 8477487, at \*7-8 (N.D. Cal. 2015) (club lead list); *Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.,* 679 F.Supp.2d 894 (N.D. Ill. 2010) ("Nor is there a whisper about those targets, or any of them, being people who, or institutions that, had consented to [the defendant's] faxing them"); *G.M. Sign, Inc. v. Finish Thompson, Inc.,* No. 07 C 5953, 2009 WL 2581324 (N.D. Ill. 2009) ("[F]axes were sent to anonymous third-party fax lists procured by [the defendant's agent] which [the defendant] did not review."); *Hinman v. M & M Rental Ctr., Inc.,* 545 F.Supp.2d 802, 807 (N.D. Ill. 2008) (question of consent was "common" where the defendant transmitted faxes to numbers on a "leads" list it had purchased from a third party); *Kavu, Inc. v. Omnipak Corp.,* 246 F.R.D. 642, 645 (W.D. Wash. 2007) (fax list purchased from third-party vendor that falsely believed it had consent due to misreading of the law).

member provided his or her wireless phone number to an underlying creditor requires an individualized inquiry into the particular circumstances in which the debt arose, and such individualized inquiries predominate over any issue common to the class); *Connelly v. Hilton Grand Vacations Co.*, LLC, 294 F.R.D. 574, 578 (S.D. Cal. 2013) ("It is likely that each individual received a different amount of information regarding how his cell phone number would be used and …[t]his diversity suggests that the issue of consent should be evaluated individually, rather than on a class wide basis."); *Balthazor v. Cent. Credit Servs.*, No. 10-62435-CIV, 2012 U.S. Dist. LEXIS 182275, at *10 (S.D. Fla. Dec. 27, 2012) (Judge Cohn denied a TCPA class action, finding the issue of consent to be too individualized); *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 237 (S.D. Ill. 2011) (TCPA class action simply "unmanageable" given issues of individual consent); *Hicks v. Client Servs.*, No. 07-61822-CIV, 2008 U.S. Dist. LEXIS 101129, at *20 (S.D. Fla. Dec. 10, 2008) ("[U]ltimately consent is an issue that would have to be determined on an individual basis at trial.").[9]

The Certification Motion ignores all of this authority and pretends as if TCPA cases are tailor made for certification. *See* Certification Motion, pp. 5-6. But that is a half-truth at best. While single-source TCPA cases are often certified, class actions in the debt collection context—where the numbers come from numerous consumers under different circumstances—are rarely, if ever, certifiable. The district court in *Selby* explained why:

---

[9] One district court has formulated a different rule that looks to whether the *Defendant* has introduced evidence that class members consented to calls. *See Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92, 106 (N.D. Ill. 2013). This formulation misses the difference between multi-source and single-source cases. It also improperly puts an evidentiary burden on Defendant when the Eleventh Circuit has held that Plaintiff has the burden of demonstrating every element of Rule 23. *Valley Drug Co.*, 350 F.3d at 1187. Nonetheless, Ally has introduced sufficient evidence demonstrating why the Certification Motion must be denied applying any standard.

> [I]n an action arising out of debt collection phone calls, common evidence d[oes] not exist where "an individual review of loan documents and other files related to the underlying debt obligation" would be required to determine whether "each individual gave 'express consent'[.]" (Citations Omitted.)
>
> In contrast, where the defendant obtained the class members' cell phone or fax numbers from a single source or from the class members under very similar circumstances, the issue of consent can potentially be resolved on a classwide basis. (Citations Omitted)
>
> Similarly, in *Manno v. Healthcare Revenue Recovery Group, LLC*, 289 F.R.D. 674, 688 (S.D. Fla. 2013), all of the class members "went through the same or similar admissions processes, during which they provided their phone numbers." Therefore, although the defendant argued the class members consented "ipso facto" under the TCPA by providing their cell phone numbers during the admissions processes, this issue was suitable for resolution on a classwide basis and did not present individualized issues that would defeat the predominance requirement. (Citations omitted.)

*Selby*, 2016 U.S. Dist. LEXIS 83940, at *12-14.

Even more recently, the *Stein* court denied certification in another multi-source debt collection case finding: "[t]his court would have to examine consent—a defense Monterey intends to raise against every class member—on a person-by-person basis..." *Stein*, 2017 U.S. Dist. LEXIS 12707, at *16. The *Stein* court found that these issues would exist even if the Defendant engaged in common conduct: "[e]ven if Monterey callers asked each debtor the same question, whether a debtor perceived his or her answer to that question as providing consent to receive subsequent calls is an individualized inquiry that would require the court to ascertain each debtor's interpretation, or understanding, of that question." *Id.* at *15.

At bottom, TCPA cases—such as this one—involving "a series of individual transmissions under individual circumstances, each of which is an alleged violation of the statute" are simply not certifiable. *See Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 402 (E.D. Pa. 1995); *Gene and Gene, LLC*, 541 F. 3d. at 327 (citing *Forman* with approval).

**1. Plaintiff Has Failed to Demonstrate Even Basic Commonality Among His Class Members**

The 23(a)(2) commonality prong requires that class member claims depend upon a common contention that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, (2011). Rule 23(a)(2) sets a lower standard than Rule 23(b)(3). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997) (recognizing that "the predominance criterion is far more demanding" than commonality). But a Plaintiff does not meet even the low bar of Rule 23(a)(2) where he complains about numerous discrete incidents rather than of a common practice. *See, e.g., McCamis v. Servis One, Inc.*, No. 8:16-CV-1130-T-30AEP, 2017 U.S. Dist. LEXIS 20522, at *10-11 (M.D. Fla. Feb. 14, 2017).

Plaintiff attempts to avoid individualized issues on consent by referencing Ally's account records and policies. *See* Certification Motion, p. 13 (listing Plaintiff's asserted "common contentions").[10] Ally's policies, however, demonstrate an effort to comply with the TCPA and not evade it. *See* Accurso Dec., ¶¶ 7-24. As such Plaintiff must fall back on his vague reference to numbers "noted" by Ally as "Wrong Number" or "Do Not Call" in the hopes of certifying a class of anomalies. But there is nothing common between individuals whose numbers bear such notes (whatever notes Plaintiff may mean). Something *specific* and *unique* had to occur with respect to each phone number before each such note was

---

[10] Plaintiff appears to have (rightly) withdrawn his allegation in the Complaint that "Whether Ally's actions violated the TCPA" is a common question. *See* Compl., ¶ 46. He omits that assertion in his Motion. *See* Certification Motion, p. 13.

placed. That is, the class member had to *say* or *do* something that lead to the note being placed and, crucially, it is what the class member *said* or *did* that matters for liability purposes; not the presence of the note itself. The presence of the note alone, therefore, resolves *nothing* "in one stroke." *Carriuolo v. GM Co.*, 823 F.3d 977, 984 (11th Cir. 2016).

Matters are worse with respect to the subclass. Before a further call can be attempted to a number noted with an "x" or "w" code in CARS, the class member would have had to say or do something *more*. This is so because Ally's technology categorically prohibits calls to numbers bearing such "notes." *Id.*, ¶¶ 20, 23; Heiner Dec., ¶¶ 5-6, 9. Hence only if a customer re-conveys consent to Ally to in some manner can calls continue. Hall Dec., ¶ 9; McClure Dec., ¶ 9. Once again, however, Plaintiff has failed to demonstrate that class members all said or did the *same thing* to cause further calls. As a factual matter, the variety respecting such re-consents is endless. *See., e.g.,* Johnson Dec., ¶ 10. So there is even less common to individuals in the subclass from a liability perspective than in the primary class.

Plaintiff also implies that a number is "noted" as a "Do Not Call" or "Wrong Number" merely because a text string note bearing certain words exist in related SHAW notes. But this is his worst argument of all. Stated plainly, the free form phrases "do not call" or "wrong number" are not very meaningful on the issue of consent to call a cellphone. Accurso Dec., ¶¶ 26-28; 30-35; Johnson Dec., ¶¶ 3, 5-10; Hall Dec., ¶¶ 3-5; McClure Dec., ¶¶ 3-5; Sponsler Report, ¶¶ 11(j); 12. As a factual matter these notes can be entered under a wide variety of circumstances having nothing to do with the validity of the underlying phone number. *See., e.g.,* Accurso Dec., ¶¶ 26-27; 30, 32-33; Johnson Dec., ¶¶ 5-10; Hall Dec., ¶ 4; McClure Dec., ¶ 4; Sponsler Report, ¶ 11(j). So the circumstances of one class member will

look nothing like the circumstances of another.

And there's an even more fundamental problem here—there is no commonality between the "Do Not Call" portion of the class and the "Wrong Number" portion of the class. These are two wholly different sets of people whose claims arise under different circumstances and that are subject to wholly different legal issues. *See Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 297 (N.D. Ill. 2014) ("[T]he central inquiry in a 'wrong party' case is *who* provided consent, whereas the central inquiry in an actual debtor case is *whether* the plaintiff provided consent to receive calls on his or her cell phone."). The class, therefore, is at war with itself with respect to the evidence needed to prove liability. Putative Class Counsel's effort to combine these two unrelated factions—likely as a subterfuge to allow Mr. Tillman to represent the "do not call" portion of the class—is yet a further complete bar to the certification of the classes he proposes.[11]

**B.   Plaintiff Has Failed to Demonstrate Predominance of Common Issues Regarding Consent**

Rule 23(b)(3) definitively prevents certification of cases seeking money damages where, as here, common issues do not predominate over individualized issues. Fed. R. Civ. P. 23(b)(3); *Amchem Prods., Inc*, 521 U.S. at 615. To determine whether common questions

---

[11] Plaintiff's remaining arguments on commonality are virtual throwaways. First, he states that whether or not Ally "willfully" violated the TCPA respecting each class member is a "common issue." Certification Motion, p. 13. As shown above, however, the circumstances surrounding each call to each class member turns on the specific circumstances under which each relevant note was created and, where necessary, subsequently removed to authorize further dialing. Nothing respecting Ally's intent can be presumed from these discrete circumstances on a classwide basis. That leaves the equipment used to "place" calls. But part of the class involves calls "placed" using "the same dialing system(s) it used to call Plaintiff." Another portion involves the use of an "artificial or prerecorded voice." Certification Motion, p. 4. Plainly, however, the evidence needed to prove the use of an ATDS is entirely different from the evidence needed to prove the use of a pre-recorded voice message. Once again, therefore, there is no common issue unifying the class that resolves an issue of liability "in one stroke." *Carriuolo*, 823 F.3d at 984.

predominate, the Court is "called upon to examine the cause[] of action asserted in the complaint on behalf of the putative class. (citation omitted)." *Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1234 (11th Cir. 2000). "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Id.* (citing *Amchem Prods., Inc.*, 521 U.S. at 623 ("[The predominance] inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy.")).

### 1. The "Do Not Call" Component of the Class Masks Numerous Individualized Inquiries Regarding Consent

In TCPA cases, "the issue of consent will entirely determine how the proposed class-action trial will be conducted on the merits." *Gene and Gene LLC* , 541 F.3d at 327. Thus, a discussion of the substantive law of consent is necessary to assess certification. *Castano v. American Tobacco* Co., 84 F.3d 734, 744 (5th Cir.1996) ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").

As laid out above, Ally's robust TCPA policies assure that it does not call customers without initial consent. Consent for TCPA purposes exists anytime a customer provides a number directly to an informational caller. *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1118, 1123-26 (11th Cir. 2014) (Courts are bound to follow FCC ruling that "express consent" exists whenever consumer provides phone number to caller). Debt collection calls are informational calls. *See In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1838, ¶ 20 (2012) ("calls solely for the purpose of debt collection ...do not constitute telemarketing[.]"). As such Ally

may call any customer at any number he or she has provided in connection with an account. *See, e.g., Stauffer v. Navient Sols., LLC*, No. 1:15-CV-1542, 2017 U.S. Dist. LEXIS 35256, at *15 (M.D. Pa. Mar. 13, 2017) ("[A] debtor consents to debt-related calls from her creditor when she 'knowingly releases' her wireless number thereto."). And even though written express consent is not required, Ally's consent disclosures are enforceable[12] affording Ally both suspenders and a belt.[13] Finally, once obtained, consent does not expire. *See Dolemba v. Kelly Servs.*, No. 16 C 4971, 2017 U.S. Dist. LEXIS 13508, at *5 (N.D. Ill. Jan. 31, 2017) (consent provided nine years earlier "d[id] not expire at some point in time on its own").

Faced with these realities, Plaintiff complains that Ally calls numbers after noting them as "Do Not Call" in its own records.[14] Plaintiff has introduced no evidence to the effect that Ally does so as a matter of common practice. Indeed, he steadfastly avoided introducing any evidence of Ally's "do not call" policies at all. The reason is obvious—Ally works hard to respect customer consent preferences and will stop calling customers immediately upon demand. Accurso Dec., ¶¶ 7-17; 22-24.

But proving a revocation of consent is an extremely fact-specific issue and pointing to snippets from free form notes containing the words "do not call" would never suffice.

---

[12] *See Stauffer*, 2017 U.S. Dist. LEXIS 35256, at *1-2, 15-16 (binding plaintiff to the consent language in her promissory note).

[13] Notably, consent provided to an Ally agent allows calls to be made on its behalf by a third-party collector or vendor. *Harrington v. RoundPoint Mortg. Servicing Corp.*, No. 2:15-cv-322-FtM-38MRM, 2017 U.S. Dist. LEXIS 55023, at *12 (M.D. Fla. Apr. 10, 2017) ("[A] third-party debt collector can lawfully make autodialed or pre-recorded calls regarding a debt incurred 'to a wireless number that the consumer had provided to the creditor, which the creditor had then passed along to the debt collector.'").

[14] Plaintiff's primary "Do Not Call" class does not require that a number be called after the "Do Not Call" notation, just that the customer received "at least two phone calls." But receiving multiple calls yields nothing on the issue of whether or not Ally had consent to place the calls. So the vast majority of "Do Not Call" class members would lack a valid claim—they did not receive a call after the date of revocation.

Consent can only be effectively revoked by way of a "clear expression" that messages should stop. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 8001, ¶ 63 (2015) ("2015 FCC Order"). Courts have taken a narrow view of revocation, refusing to infer revocation from conduct. *Van Patten v. Vertical Fitness Grp.*, LLC, 847 F.3d 1037, 1048 (9th Cir. 2017) (cancelling gym membership did not "clearly express [plaintiff's] desire not to receive further text messages"); *In re Runyan*, 530 B.R. 801, 807 (M.D. Fla. 2015) ("express and clear revocation of consent [for TCPA purposes is required]; implicit revocation will not do."). And revoking consent is extremely context specific and turns on the facts of a given situation. *See, e.g., Soulliere v. CFI Resorts Management, Inc.*, No. 8:13-cv-2860 (M.D. Fla. 2015), corrected judgment dated May 28, 2015, Doc. 99 (jury finding that phrase "please don't call my cell phone" did not effectuate a valid revocation in that case); *In re Runyan*, 530 B.R. at 807 (consumer telling caller that "it could contact his attorney with any further questions" was not express revocation); *Buchholz v. Valarity, LLC*, No. 4:13CV0362 TIA, 2015 WL 590381, at *2 (E.D. Mo. Feb. 11, 2015) (question of fact whether phrase "stop calling me" was sufficient to revoke consent since the caller did not identify himself on the call); *see also Harrington v. Roundpoint Mortg. Servicing Corp.*, No. 2:15-cv-322-FtM-38MRM, 2017 U.S. Dist. LEXIS 55023, at *28-29 (M.D. Fla. Apr. 10, 2017) (the "existence and scope" of a third party's actual or apparent authority for conveying or revoking consent on behalf of the subscriber "is properly left for the trier of fact").

Given the highly factual nature of the revocation inquiry, it is no surprise that a "revocation" class of the kind Plaintiff seeks to certify here has never been certified before.

Indeed, these sorts of classes rarely get past the pleadings stage. *See Cholly*, 2017 U.S. Dist. LEXIS 14449, at *11 (striking revocation class because "individual inquiries necessary to determine class membership will 'inevitably predominate' over any common questions of fact"); *Wolfkiel v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 293 (N.D. Ill. 2014) (striking "revocation class" allegations because "in order to determine whether each potential class member did in fact revoke his or her prior consent at the pertinent time, the Court would have to conduct class-member-specific inquiries for each individual").

Plaintiff's "Do Not Call" class fairs no better than Ms. Cholly's or Mr. Wolfkiel's. Given the large variety of circumstances under which an agent may enter a note containing the phrase "do not call" (*see, e.g.,* Hall Dec., ¶ 4; Johnson Dec., ¶¶ 8-9) there is no basis to infer a note containing such a phrase pertains to a request that calls cease to begin with. Even if it did, however, to assess liability the Court must determine what the class member actually said that lead to the "do not call" report. Was it an express and clear request not to be called any further on that number? Was it unconditional? Why did the number then receive further calls? Did the customer ever subsequently re-consent by providing his phone number or asking for further calls?[15] Literally *none* of those questions will have a common answer as between even two class members. An avalanche of mini-trials is therefore inevitable. *See, e.g., Warnick v. Dish Network LLC*, 304 F.R.D. 303, 306 (D. Colo. 2014) (rejecting class of "anomalies" identified through data review as creating more individualized

---

[15] Previously revoked consent may be re-conveyed by the customer re-supplying the number to Ally. *See Lawrence v. Bayview Loan Servicing, LLC,* 666 F. App'x 875, 880-81 (11th Cir. 2016) (unpublished); *Reyes v. Educ. Credit Mgmt. Corp.*, No. 3:15-cv-00628-BAS-JMA, 2016 U.S. Dist. LEXIS 66821, at *11 (S.D. Cal. May 19, 2016).

inquiries).

Given the wide variety of circumstances under which notes containing the phrase "do not call" might be entered, the steep showing required to make out an effective revocation, and the prevalence of class member's "re-consenting" after revocation occurs, trial on the "Do Not Call" subclass is sure to devolve into a series of mini-trials.[16]  This, of course, is why TCPA cases are never certified in the absence of generalized proof of consent.  *See Gene & Gene LLC,* 541 F.3d at 326-29; *Espejo,* 2016 U.S. Dist. LEXIS 142259, at *30.

### 2. The "Wrong Number" Component of the Class Masks Numerous Individualized Inquiries Regarding Consent

Determining whether Ally made any "true" wrong number calls to class members requires myriad inquiries.  In the first place it is insufficient to merely compare Ally's call lists to subscriber information available from wireless carriers via subpoena—Ally can rely on the consent of its customer so long as the customer regularly uses the phone.  *See* 2015 FCC Order, ¶ 75 (consent to call a cell phone can be provided by subscriber or the regular user).  Determining whether or not a customer was authorized to use the phone, however, is plainly an individualized inquiry that would need to be determined on a class member by class member basis to assess whether Ally had the necessary consent to place each call.

Plaintiff attempts to sidestep this hurdle by relying on Ally's free form notes but, as shown above, they are not very informative.  The words "wrong number" commonly have nothing to do with a phone number at all.  Accurso Dec., ¶¶ 26-28; Johnson Dec., ¶¶ 3, 5-7, 10; Hall Dec., ¶ 4; McClure Dec., ¶ 4; Sponsler Report, ¶¶ 11(j).  Even when they do,

---

[16] Ally has a "constitutional right to a jury determination as to whether any person consented to receiving calls to their cellular telephone." *Shamblin,* 2015 WL 1909765, at *7 (citing *Rink,* 203 F.R.D. at 652).

however, the chances are high that the number remained valid due to a false report by a customer or errant third party. Accurso Dec., ¶¶ 26-28; 30-35; Johnson Dec., ¶ 3; Hall Dec., ¶¶ 3, 8; McClure Dec., ¶¶ 3, 8; Sponsler Report, ¶ 12. This occurrence becomes more common as the period of delinquency increases. Johnson Dec., ¶ 3. Indeed, as Plaintiff's own evidence demonstrates, Ally's agents actually ask "probing questions" of a call recipient reporting a "wrong number" to determine whether, for instance, "[t]he number is correct but the customer is not available at the number" or "[t]he person knows the customer and says the customer can be reached at the number." Certification Motion, Exhibit 1. If, therefore, a "wrong number" notation exists in SHAW *without* a "w" code in CARS the only presumption to be drawn is that the agent determined that the number was actually valid. Johnson Dec., ¶ 5; Accurso Dec., ¶¶ 18-21. To prove otherwise would require an individualized showing that the agent failed to act in accordance with Ally's policies.

But even the more reliable presence of a "w" in CARS does not assure that a wrong number was actually called. Ally's agents must insert a "w" anytime they cannot *affirmatively* determine the validity of a number following a "wrong number" report. Hence, a large number of "w" notes will have resulted from false reports from debtors or third-parties. *See, e.g.,* Hall Dec., ¶¶ 3, 6, 8; Johnson Dec., ¶ 3. Even if the number was coded "w," therefore, Ally would have the right to introduce its own evidence to the contrary—including the cross-examination of each customer it was trying to reach—in order to determine whether Ally had really reached a called party without consent. *See Shamblin,* 2015 WL 1909765, at *7 (noting constitutional right to submit evidence on the issue of consent). Further, even in those instances where a wrong number was dialed, an individual

24

review would still be needed to determine whether Ally's call was its *first* attempt to reach the customer after a number had changed hands. *See* 2015 FCC Order, at 8000-01(affording wrong number callers a one call safe harbor for calls made with a customer's consent).

Plaintiff cites to *Abdeljalil v. GE Capital Corp.*, 306 F.R.D. 303 (S.D. Cal. 2015) to support his request for certification. *Abdeljalil* is an anomalous case—the only one of its kind in the country and, frankly, the definition certified in that case suffers from numerous flaws. But *Abdeljalil* is easily distinguished because it did not deal with a situation where, as here, a plaintiff's evidence demonstrates that the words "wrong number" will often be found in notes pertaining to *valid* phone numbers. *Abdeljalil*, 306 F.R.D. at 306. Instead, the class certified in that case included only individuals who "were not customers of Defendant at the time of the calls" and who did not previously give "express consent." *Ibid.*[17]

The recent decision in *Davis v. AT&T Corp.*, No. 15cv2342-DMS (DHB), 2017 U.S. Dist. LEXIS 46611 (S.D. Cal. Mar. 28, 2017) is better reasoned and right on point. There, as here, Plaintiff attempted to certify a class of individuals based upon wrong number reports in a defendant's notes. *Davis*, 2017 U.S. Dist. LEXIS 46611, at *6. Plaintiff argued "a notation in Defendant's records to the effect of 'wrong number' is sufficient to establish on a class-wide basis without individualized inquiry that Defendant made a call to a number it did not have consent to call." *Id.* The Court rejected this theory, finding that "wrong number" notations "would not absolutely resolve" the issue of consent. *Id.* For one, the parties "would still have to go through the 'wrong number' notations to determine whether those call

---

[17] Membership in such a class would plainly be unascertainable under the Eleventh Circuit standard, which requires a class definition to be defined based upon "objective criteria." *Haight v. Bluestem Brands, Inc.*, No. 6:13-cv-1400-Orl-28KRS, 2015 U.S. Dist. LEXIS 107010, at *7 (M.D. Fla. May 14, 2015).

recipients were, in fact, customers of Defendant at or before the time of the calls." *Id.*
Indeed, as the Court recognized, "a 'wrong number' provides nothing because many
customers tell callers they have reached the wrong number, though the customer's number
was dialed, as a 'procrastination tool' to avoid speaking on the phone." *Id.* "Likewise, if
Defendant's customer provided a number belonging to another person, such as a spouse or
other family member, an inquiry into that customer's authority to provide consent to call that
number would be required." *Id.* In sum, the Court held that a "complete analysis" of each
"call recipient's individual circumstances" would be required. *Id.* at *16.

As shown above, all of the concerns underlying the *Davis* court's rejection of
Plaintiff's certification theory exist here as well. *Davis* is not distinguishable and this Court
should follow its persuasive reasoning.

### 3. Individualized Inquiries Unrelated to Consent Also Abound

Consent issues are merely the tip of the predominance iceberg. Fully 25% of the
accounts Ally owns contain arbitration clauses including class action waivers. Declaration of
George Adamson, ¶¶ 3-4; Hampton Dec., ¶¶ 6-9 (noting many of Ally's approved forms
contain arbitration clauses and attaching Florida forms as examples); Accurso Dec., Ex. A
(even the RISC on the Everett account contains an arbitration clause); Goldsmith Dec., Exs.
B, C, D, and E (examples of Ally's successful enforcement of arbitration clauses).
Identifying whether or not each class member is subject to a binding arbitration agreement,
therefore, raises an impassable hurdle to certification. *See Avilez v. Pinkerton Gov't Servs.,*
596 F. App'x 579, 579 (9th Cir. 2015) (unpublished) ("The district court abused its discretion
to the extent it certified classes and subclasses that include employees who signed class

action waivers."); *Hill v. T-Mobile USA, Inc.*, No. 2:09-CV-1827-VEH, 2011 U.S. Dist. LEXIS 157669, at *34 (N.D. Ala. May 16, 2011) ("Plaintiffs [] have not addressed how to effectively back out from [the class] those persons who would potentially be ineligible due to the operation of valid class action waivers and/or agreements to arbitrate (and no subsequent efforts made to opt out), absent undergoing an individualized inquiry[.]"); *see also Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) (affirming denial of certification because defendant's "intent to seek arbitration of the class would necessitate a state-by-state review of contract conscionability jurisprudence").

Similarly, Plaintiff cannot represent class members at trial that lack Article III standing to pursue their claims. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053(2016) (Roberts, J, Alito, S, concurring). "[I]f there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand." *Id.*[18] Yet after the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), innumerable, unascertainable, members of the class lack any harm because they did not actually receive the call at issue.[19] Such individuals could not possibly possess Article III standing. *See* Ally's Motion for Summary Judgment, Doc. 73, pp. 11-20. Since the class definitions contain numerous individuals that cannot recover damages the class is facially

---

[18] There is a messy split of authority as to whether a class may contain absent members lacking standing at time of certification but all circuits agree that such class members cannot ultimately recover damages. *E.g., In re Nexium Antitrust Litig.*, 777 F.3d 9, 31-32 (1st Cir. 2015) (noting that "only injured class members will recover" damages, although certified class included some members that were not harmed).

[19] *See* Doc. 58, p. 10 ("Any arguments concerning whether plaintiff and consumers were harmed by calls they did not receive or notice is more appropriately addressed at the class certification stage.").

overly broad and cannot be certified on that basis alone. *C.C. & P.C. v. Sch. Bd. of Broward Cty.*, No. 10-60032-CIV, 2014 U.S. Dist. LEXIS 134530, at *24-25 (S.D. Fla. Sep. 23, 2014) ("[w]hen the proposed class includes many members without claims, the court may deny certification"), citing *Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012). Moreover, Plaintiff offers no plan for weeding out class members that did not actually "receive" the calls Ally "placed." But at trial Plaintiff would be required to show that each call at issue caused harm to an identifiable class member in order to recover damages related to that call. Once again, therefore, an avalanche of mini-trials awaits.

Finally, it appears that Plaintiff's class may include *both* users and subscribers to the same phone. That means that multiple people may be competing to recover for a single phone call. That raises myriad additional inquiries to determine who is in the better position to recover the statutory damages at issue and underscores the radically different circumstance between subscribers and users of such phones in terms of proving their case. *Haight*, 2015 U.S. Dist. LEXIS 107010, at *7 (addressing a lack of common issues between phone "users" and phone "subscribers" seeking to recover for calls).[20]

## C.   Class Members Cannot Be Identified in an Administratively Feasible Manner

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable.'" *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1970)). In the Eleventh

---

[20] That raises the issue of whether Plaintiff's girlfriend's father—the owner of the Cell Phone—might be a necessary party to this case with standing to sue and recover for the very same calls Plaintiff is seeking to recover for here.

Circuit, ascertainability involves two separate requirements: i) the class definition must be "identifiable" in that it cannot be excessively vague (*Bush v. Calloway Consol. Grp. River City, Inc.*, No. 3:10-cv-841-J-37MCR, 2012 U.S. Dist. LEXIS 40450, at *12 (M.D. Fla. Mar. 26, 2012) [class definition cannot be "amorphous or imprecise"]); and ii) there must be an "administratively feasible" way to identify class members with valid claims. *Karhu v. Vital Pharms.*, Inc., 621 F. App'x 945, 947-48 (11th Cir. 2015) ("[A] class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way") (unpublished); *see also McCamis v. Servis One, Inc.*, 2017 U.S. Dist. LEXIS 20522, at *6 ("The Eleventh Circuit instructs that 'a class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way.'").[21]

Indeed, so stringent are the Eleventh Circuit's rules surrounding ascertainability that a Plaintiff seeking to certify a case must affirmatively submit a trial plan that specifically addresses issues of ascertainability and manageability. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279, fn. 20 (11th Cir. 2009); *see also Kelecseny*, 262 F.R.D. at 677 (S.D. Fla. 2009) (denying certification in part because plaintiff's "trial plan does not promote judicial efficiency, nor is it superior to other methods of adjudicating potential claims against Defendants"); *James D. Hinson Elec. Contracting Co. v. BellSouth Telecommunications, Inc.* 642 F. Supp. 2d 1318, 1328 (M.D. Fla. 2009) (Courts in this Circuit "expect plaintiff[s] to submit a trial plan with [a] motion to certify a class").

---

[21] While Circuits differ on the ascertainability standard, the Eleventh Circuit "applie[s] a fairly strong version of an ascertainability requirement." *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015).

As already demonstrated, the newly proposed class is indecipherably vague. On that basis alone the Certification Motion should be denied. But a larger problem looms as well—Plaintiff has presented no clear explanation as to how he intends to identify class members, much less the formal trial plan he was required to provide.[22]  Specifically, Plaintiff has not explained how identifying class members is a "manageable process" that does "not require much, if any, individualized inquiry." *See, e.g., Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014) (internal quotations and citation omitted); *Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 663-664 (N.D. Ala. 2010) ("...the named plaintiff must define the proposed class in a manner that adequately identifies its members. Who, exactly, are they, and how can they be located?").

Cobbling together Plaintiff's plan for him, it appears that he intends to ascertain class member identities by sending a list of phone numbers gleaned from Ally's records to wireless carriers via subpoena. This plan *might* identify subscribers to phone lines,[23] but it certainly would not identify individuals—such as Plaintiff—that were merely using the phone at issue on the date each call was "placed." Sponsler Report., ¶¶ 7-12. So Plaintiff has offered no method of identifying and notifying class members. *See Haight*, 2015 U.S. Dist. LEXIS

---

[22] Ally specifically served discovery demands requesting Plaintiff's trial plan and the need for a trial plan was laid out for Plaintiff in Ally's motion to compel. *See* Doc. 87, pp. 4-8. Yet no trial plan has been submitted.

[23] As set forth in the expert report of Ken Sponsler, even identifying the subscribers to the cell phone number at the time the calls were placed is no simple matter and raises numerous unmanageable individual inquiries. *See* Sponsler Report, ¶¶ 7-12. Moreover, several Courts have recognized the systemic flaws in attempting to identify class members through carrier records. *See, e.g., Smith v. Microsoft Corp.*, 297 F.R.D. 464, 473 (S.D. Cal. 2014) ("Moreover, in light of the record retention policies of some of the major cellular service providers, it is likely that even subpoenaing the cellular service providers will not yield the necessary identification and contact information [going back five years]."); *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 525 (E.D. Wis. 2014) (finding subpoenas unlikely to be helpful in identifying putative class members). Nonetheless, Ally remains willing to stipulate away the issue as previously offered, but not so long as Plaintiff continues to demand burdensome class discovery to overcome it. Plaintiff does not get to have it both ways.

107010, at *11.[24] Plaintiff tries to hide this reality in the vague language of his class definition—which rides the fence and does not commit to either a "subscriber" or "user" approach —but that just makes the unascertainability of his class all the more patent.

Further, there will never be a list of phone numbers to send to the carriers anyway. It is impossible to identify the cell phone numbers associated with free form SHAW notes absent a file by file search. Heiner Dec., ¶ 10. Similarly, there is no way to identify numbers that were *previously* marked as "x" or "w" in CARS but that subsequently regained dialer eligibility absent a file by file search. *Id.*, ¶ 9. Even if Plaintiff's proposed ascertainability method were feasible, therefore, a list of class member numbers could not be generated in an administratively feasible way. *E.g. Christie v. Bank of Am., N.A.*, No. 8:13-CV-1371-T-23TGW, 2016 WL 654818, at *8 (M.D. Fla. Jan. 7, 2016) ("The plaintiffs cannot merely point to BANA's computer system for their argument that the putative class is easily ascertainable."). These additional defects also preclude certification.

**D.    Plaintiff Has Failed to Meet his Burden of Demonstrating the Remaining Rule 23 Factors Have Been Satisfied As Well**

    **1.    Plaintiff Has Failed to Demonstrate Numerosity With Respect to His New Class Claims**

The Certification Motion states: "[i]n this case, Ally concedes numerosity." Certification Motion, p. 8. That is not true. Ally *offered* to stipulate that over 100 instances of specific notes exist in its records, but Plaintiff did not accept that stipulation. *See* Doc

---

[24] Plaintiff tries to leap the ascertainability hurdle by suggesting that Ally has made a series of stipulations on the matter. Ally never entered into any stipulations; it only *offered* stipulations if Plaintiff agreed to withdraw his pending demands seeking class discovery or as an agreed upon condition in the event the Court issued a protective order Ally requested. *See* Doc 104-1, ¶¶ 10-18; Doc. 104-6; Doc. 113-4, ¶¶ 3, 5. Yet Plaintiff is trying to have his cake and eat it too. On the one hand he wants to make use of the proposed stipulations, but on the other hand he still asks the Court to compel further discovery. *See* Doc. 107 (Plaintiff's Motion to Compel).

104-1, ¶¶ 10-18; Doc. 104-6; Doc. 113-4, ¶¶ 3, 5.  Those notes do not correlate to Plaintiff's new class definitions anyway.  As such Plaintiff has offered nothing demonstrating his class is sufficiently numerous to certify.[25]

## 2.   Plaintiff is Not a Typical Class Member

"A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).  Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Busby*, 513 F.3d at 1322.

As shown above, Plaintiff's class improperly blends two very discrete populations—owners/users of numbers noted as a "wrong number" and owners/users of numbers noted as a "do not call"— into a single class.  Given the differences between these pools of class members there can be no "typical" member to begin with.  But Plaintiff does not even try to tie his own circumstances back to the class definition anyway.  For instance, Plaintiff does not demonstrate that the "wrong #" notation on the underlying customer account is used as part of Ally's policies.  It is not.  Johnson Dec., ¶ 5; Accurso Dec., ¶ 26.  Instead, the only evidence he supplies is Exhibit 1, which does not address "notations" of any kind.  Rather, the policy Plaintiff supplies speaks of the need for Ally's agents to stop calls to "invalid" numbers using a "w" status code in SHAW.  There is a clear disconnect, therefore, between Plaintiff's situation and the members of the class he seeks to represent.

Further, Plaintiff is not a typical member of the "wrong number" class because he

---

[25] Ally remains willing to stipulate on the issue of numerosity if Plaintiff agrees to withdraw his pending class discovery demands or if the Court issues the protective order Ally requested.  *See* Doc. 104, p. 20 ("Ally will stipulate to it if that resolves the data issues.").

allegedly received a call that is outside of Ally's course of doing things. He suffered an alleged injury that typical members of the class would not have suffered—the typical class member was not injured at all. Simply put, his case arose from a one-off mistake. But Plaintiff's class is *not* defined based upon individuals that suffered from a similar sort of mistake. Rather it is vaguely and broadly defined to include phone numbers that were *properly* identified as a "Wrong Number" in Ally's records and were never called again.

As such, Plaintiff's case law addressing typicality is entirely unsuited to the situation present here. In each of those cases, "the course of conduct that produced [Plaintiff's] TCPA claim also produced the claims of the proposed class." *A Aventura Ctr., Inc. v. Med Waste Mgmt. LLC*, 2013 U.S. Dist. LEXIS 97879, *10 (S.D. Fla. 2013). But here the opposite is true. Ally's course of conduct *prevents* the sort of injury Plaintiff suffered here. So the "typical" class member experience would have been wholly different from Plaintiff's.

Similarly, Plaintiff is not a typical member of the "Do Not Call" portion of the primary class. The "do not call" reference in the Everett SHAW notes pertains to action taken by Ally's agent in notating the account after receiving notice that Plaintiff filed this lawsuit. Accurso Dec., ¶ 33. Plaintiff does not demonstrate that this was the "typical" experience of class members. Nor did Plaintiff receive any calls following a "do not call" notation regarding the Cell Phone. *Id.* Both as a matter of standing and typicality, therefore, Plaintiff cannot represent the portion of the class that did receive such calls.[26]

---

[26] *See Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1288 (11th Cir.2001) ("[J]ust as a plaintiff cannot pursue an individual claim unless he proves standing, a plaintiff cannot represent a class unless he has standing to raise the claims of the class he seeks to represent"); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000) ("It is not enough that a named plaintiff can establish a case or controversy

Finally, as Ally argued in its Motion to Deny Class Certification, there are several and significant defenses unique to Plaintiff's case. *See* Doc. 74-15-16 (noting, for example, the issue of Plaintiff's standing, his shared use of the phone, his use of the Block-It application, and his memory problems). As with adequacy, these unique defenses also preclude a finding of typicality. *See, e.g., Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 383, fn. 4 (C.D. Cal. 2016) (finding plaintiff was not typical in a TCPA case where "the major focus of this litigation will be on these issues and defenses unique to Nghiem, not on the claims of the class... Defendants will assert these defenses, and they have a factual basis for doing so").

### 3.  Plaintiff and His Counsel Are Definitively Inadequate to Represent the Class

Ally has already filed a motion to deny certification on this ground. *See* Doc. 89.  It will not repeat arguments here.  It only supplements its prior showing as follows:

Plaintiff, both directly and through his counsel, has been consistently dishonest in this litigation. First, Plaintiff submitted false interrogatory responses—verified under oath— stating that he was the owner of the Cell Phone. *See* Doc. 73-5. That is not true. *See* Doc.73-2, at 16:17-18; 17:1-7; 24:19-22.  Neither Plaintiff nor his counsel have ever supplemented or amended that response.

Next, at deposition, Mr. Tillman could not get his facts straight about how he had found his lawyer. First, he stated that he had found Mr. Howard through a family member. Later, Mr. Tillman testified that he had found Mr. Howard on Google. *See* Doc. 74- 2; 11:3-25; 12:1-25; 13:1-13; 125:14-25; 132:19-25; 133:1-25. Although Mr. Howard was present at

---

between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert. Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.").

the deposition—and was surely aware of the true facts surrounding the strange backstory on the retention—he did not have his client correct his testimony.   Indeed, Plaintiff's counsel would later double down on Mr. Tillman's inaccurate testimony in Plaintiff's response to Ally's Motion to Deny Class Certification—pointing out Mr. Tillman's false testimony at his deposition that Plaintiff had looked him up on Google. *See* Doc. 85, p. 17.

Then, in an effort to obtain discovery that Plaintiff is surely not entitled to, his counsel began using a fabricated chart as though it were pulled from Ally's records.   *See* Doc. 118, p. 3; Doc. 111, p. 2; Doc. 107, p. 3; Doc. 106 at p. 2; Doc. 85, p. 3; Doc. 47, p. 8. The chart inaccurately reflected the "do not call" notation has having been entered on April 20, 2016.   *Id.*  Mr. Biggerstaff—Plaintiff's retained yet undisclosed expert—also submitted a false declaration supporting this date.   Doc. 47-2, p. 8.   The true facts are that the entry appears in Ally's records on April 29, 2016, not April 20 2016.   Accurso Dec., ¶ 32.[27]

Why the big fuss over the date?   Because the last call to the Cell Phone took place on April 21, 2016.   *Id.*, ¶ 33.   The "typo" in Plaintiff's manufactured chart back-dated the "do not call" report to one day prior to that last call.   This allowed Plaintiff to argue that calls to Plaintiff had "continued" after the "do not call" notation had been entered.   That fact would—if it were true— afford Plaintiff standing to represent a class of persons that received calls after a "do not call" notation appeared on their account.   But this fact is not true. Indeed, Plaintiff filed a *corrected* Certification Motion clearing up his "typo," yet Plaintiff still brazenly seeks to represent the "do not call" class in the Certification Motion.   Nor is this

---

[27] Plaintiff later claimed that the false charts and declaration resulted from a typo that was innocently reproduced in successive documents. *See* Doc. 123, p. 2.

the first time that this putative Class Counsel has misrepresented factual matters to get a leg up in TCPA litigation. *See Ung v. Universal Acceptance Corp.*, No. 15-127 (RHK/FLN), 2017 U.S. Dist. LEXIS 53720, at *11 n.3 (D. Minn. Apr. 6, 2017) (noting that plaintiff represented by Keogh Law, Ltd., repeatedly "distorts the record" and mischaracterizes defendant's responses to discovery).

Next, putative Class Counsel resisted the production of their Retainer Agreement with Plaintiff. *See* Doc. 87, pp. 2-3, 16-19; Doc. 87-1, ¶ 11. When it was finally produced, however, it was revealed that the agreement ████████████████████████████ ████████████████████████████████████████ ██████████████████████. *See* Doc. 105 (filed under seal).

This provision is problematic for a number of reasons. ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████ 28 █████ █████████████████. ████████████████████████. ████████████████████████████████████████ ██.29 ████████████████████████████████████ ████████████████████████████████████████

---

28 Plaintiff is working temporary jobs, lives with his mother, has three young children, holds an 8th grade education, does not have a credit card, and sometimes uses his girlfriend's credit card to buy food. *See* Goldsmith Dec., Ex. F, Excerpts from Plaintiff's Deposition, at pp. 21:2-7; 35:2-13; 36:17-24; 41:10-12; 59:19-20; 60:1-5.

29 It is no wonder, therefore, that Plaintiff testified he does not care what happens in this case. *See* Doc. 74-2, at 199:16-21; 200:21-25; 201:1.



But things are even worse here

. *See* Florida Rule of Professional Conduct

4-1.5 (prohibiting agreements for or collection of "a fee generated by employment that was obtained through advertising or solicitation not in compliance with the Rules Regulating The Florida Bar"). Counsel's dispute of these facts put them into a clear conflict of interest situation with their own client—and ultimately the class.

## E.     Class Treatment is not the Superior Way to Resolve Class Member Claims

Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In considering this factor, a court should assess, among other things, "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). "Principally, the lack of predominance belies any suggestion that a fair administration of the class claims could 'save[] the resources of both the court[] and the

parties.' (citation omitted)." *Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1184 (11th Cir. 2010).   Here, because Plaintiff fails to satisfy the predominance requirement, the Court should also find that a class action would not be superior. *See Shamblin*, 2015 WL 1909765, at *15.

Beyond the lack of predominance, class treatment is not superior because individual class members have more than a sufficient incentive to bring solo actions. *Espejo*, 2016 U.S. Dist. LEXIS 142259, at *38-39.   The Supreme Court counsels that

> [w]hile the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all. . . . The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem Prods., Inc.*, 521 U.S. at 617.

With statutory damages of $500 per violation and up to $1,500 for knowing and willful violations, the TCPA "has built-in incentives for aggrieved plaintiffs to litigate individually[.]" *Espejo*, 2016 U.S. Dist. LEXIS 142259, at *39; *see also Smith v. Microsoft Corp.*, 297 F.R.D. 464, 469 (S.D. Cal. 2014) ("[The TCPA's] 'statutory remedy is designed to provide adequate incentive for an individual plaintiff to bring suit on his own behalf.'" (quoting *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995)).

In Plaintiff's case, for example, he alleges that Ally violated the TCPA for each of the

22 calls at issue and seeks statutory damages for each violation. *See* Compl., ¶ 11.[30]
Plaintiff's potential individual recovery is therefore between $11,000 (22 x $500) and
$33,000 (22 x $1,500).[31] This is hardly the "paltry potential recovery" the Supreme Court
and the Advisory Committee had in mind for class treatment. Indeed, these statutory
remedies have been more than sufficient to incentivize plaintiffs to bring individual TCPA
claims in huge numbers.[32] The class action mechanism is therefore unnecessary and inferior
to other means to adjudicate claims. *See Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274
F.R.D. 229, 238 (S.D. Ill. 2011) (putative TCPA class members "have a quick, adequate and
superior remedy in other more speedy venues such as, for example, a small claims court").
This is especially true given the personal nature of the privacy interests the TCPA is designed
to protect; the impact of phone calls invading "privacy" will be felt uniquely by each putative
class member, emphasizing the appropriateness of individual determinations of damage.

In addressing superiority, Courts also weigh the proportionality of the defendant's
potential liability to the putative class against the harm allegedly suffered by each class
member. *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255, n.5 (11th Cir. 2003). In
the context of a TCPA case involving millions of customers, this is an extremely serious
concern. *Leysoto v. Mama Mia I, Inc.*, 255 F.R.D. 693, 696-99 (S. D. Fla. 2009) ("To grant
the requested relief would allow this Plaintiff, and his counsel to dangle the Sword of

---

[30] In his Response to Ally's Motion for Summary Judgment, Plaintiff claimed for the first time that up to 45 alleged violations of the TCPA are potentially at issue. *See* Doc. 86, p. 4. Plaintiff also seeks actual damages in his Complaint, but he offers no plan for how he would address actual damages for each class member.

[31] At 45 alleged violations, Plaintiff's potential recovery is between $22,500 and $67,500.

[32] According to statistics available on https://webrecon.com/2016-year-in-review-fdcpa-down-fcra-tcpa-up/ there were 4,860 TCPA filings in 2016.

Damocles over Defendant, without any showing of economic harm...the threat of annihilation associated with certification does not serve the purpose of the legislation, and moreover is simply unnecessary to effectively enforce the Act"); *see also Vasquez-Torres v. McGrath's Publick Fish House, Inc.,* 2007 U.S. Dist. LEXIS 97233, at *20 (C.D. Cal. Oct. 12, 2007) (denying class certification because otherwise defendant "would face 'bet the company' type stakes for a technical violation of a statute which caused no injury").

## V. FURTHER DISCOVERY WOULD CHANGE NOTHING

Plaintiff has moved to compel large amounts of customer data from Ally claiming that he needs this material to certify his class. *See* Doc. 107, pp. 7-8. This is telling.

Plaintiff's claim of "need" for Ally's customer records is tied to his desire to conduct a file by file review of Ally's records to find needles in the haystack—individuals called contrary to Ally's TCPA compliance policies. Plaintiff is right that he needs customer records to prove individual class member claims, but he is wrong that he is entitled to that information before certification is denied.

Plaintiff's burden at certification is to prove that class member claims can be determined *without* the predominance of individualized inquiries; not that the necessary individualized inquiries might be theoretically possible to undertake. *See* Fed. R. Civ. P. 23(b)(3). Plaintiff wants Ally's records so he can find individuals with valid TCPA claims, but what he has needed from the start—and has always lacked—is a *classwide* basis to demonstrate consent without such an individualized review.

As shown above, there is no way to get there. A file by file review will always be necessary to assess class member claims. So the Certification Motion must be denied.

## REQUEST FOR ORAL ARGUMENT PURSUANT TO LOCAL RULE 3.01(j)

Pursuant to Local Rule 3.01(j), Ally requests oral argument regarding Plaintiff's Corrected Motion for Class Certification.  Ally estimates the time required for argument will not exceed one hour.

Respectfully submitted this 21st day of April, 2017.

/s/ Eric J. Troutman
Eric J. Troutman, Trial Counsel (PHV)
Scott D. Goldsmith (PHV)
Divya S. Gupta (PHV)
Alexandra N. Krasovec (PHV)
DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, California 92626-7655
Telephone: (714) 800-1400
Facsimile: (714) 800-1499
troutman.eric@dorsey.com
goldsmith.scott@dorsey.com
gupta.divya@dorsey.com
krasovec.alexandra@dorsey.com

R. Frank Springfield (FL Bar # 0010871)
Jacqueline Simms-Petredis (FL Bar # 0906751)
BURR & FORMAN LLP
201 North Franklin Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 221-2626
Facsimile: (813) 357-3534
fspringfield@burr.com
jsimms-petredis@burr.com

Attorneys for Defendant
ALLY FINANCIAL INC.