UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DONELL L. TILLMAN,
individually and on behalf
of all others similarly
situated,

      Plaintiff,

v.                Case No: 2:16-cv-313-FtM-99CM

**FILED UNDER SEAL**

ALLY FINANCIAL INC.,

      Defendant.

_____

## OPINION AND ORDER[1]

    This matter comes before the Court on plaintiff's sealed, unredacted[2] Motion to Certify Class (Doc. #131) filed on April 3, 2017. Defendant filed a sealed, unredacted Response in Opposition (Doc. #140) and a Supplemental Brief in Support (Doc. #154). Defendant filed an unredacted Motion to Deny Class Certification (Doc. #89) on February 6, 2017, which plaintiff moved to strike (Doc. #77) and then responded to (Doc. #85). The Court took the Motion to Strike under advisement pending briefing on class

---

[1] The Opinion and Order is being filed under seal due to the confidential and proprietary business information contained herein. See Doc. #40, Stipulated Protective Order.

[2] The motion and its exhibits were initially filed in a redacted version (Docs. #118, 119) and a duplicate, unredacted version was filed under seal (Doc. #131). The redacted versions will be terminated as duplicative.

certification.    (Doc.  #80.)    The  parties  filed  various supplemental authorities.  (Docs. ##96, 149, 155, 156, 158.)  On May 1, 2017, defendant filed a Motion for Rule 11 Sanctions (Doc. #138)  for  plaintiff's  actions  in  connection  with  class certification, to which plaintiff responded (Doc. #143).  For the reasons set forth below, class certification and sanctions are denied.

## I.

This is a consumer-protection case arising from the receipt of autodialed calls to a cellular phone without consent.  On April 28, 2016, plaintiff Donell L. Tillman (plaintiff or Tillman), on behalf of himself and all others similarly situated, filed a one-count  class-action  complaint,  alleging  that  defendant  Ally Financial,  Inc.  (defendant  or  Ally)  violated  the  Telephone Consumer  Protection  Act  (TCPA),  47  U.S.C.  §  227,  by  placing unauthorized  calls  to  his  cellular  phone  using  an  "automatic telephone  dialing  system"  (ATDS).   (Doc. #1.)   As relevant here, the TCPA makes it unlawful for "any person," absent the "prior express  consent  of  the  called  party,"  to  make  any  non-emergency call "using automatic telephone dialing system or an artificial or prerecorded voice. . . to any telephone number assigned to a . . . cellular telephone service[.]"  47 U.S.C. § 227(b)(1)(A)(iii).

In December 2015, plaintiff began receiving such calls on his cellular phone  from Ally, seeking  to  reach  an  individual  named

Phillip Everett (Everett). (<u>Id.</u> at ¶ 9.) Ally provides consumer financing related to the purchase of vehicles via the submission of credit applications, and Everett was a customer of Ally's who had defaulted in a debt owed to Ally. Plaintiff is not a party to any debt, contract, or obligation with Ally, and has never provided his cellular telephone number to Ally for any purpose. Plaintiff's phone number was previously Everett's, and had been provided by Everett to Ally in connection with a credit application, whereby Everett consented to receiving automated calls from Ally. Plaintiff notified Ally that he was not Everett, that Everett could not be reached at the number, and requested that Ally cease further calls. Despite this, Ally continued to call Tillman approximately 22 times from January to April of 2016. (Doc. #86-1.)

Plaintiff now moves for class certification, seeking to certify a class defined as follows:

**Class**
All persons in the United States to whose cellular telephone number Ally placed at least two telephone calls using the same dialing system(s) it used to call Plaintiff, or an artificial or prerecorded voice, between April 25, 2012 and present, where Ally noted the number as a Wrong Number or Do Not Call in its records.

**Subclass**
All persons in the United States to whose cellular telephone number Ally placed at least two telephone calls using the same dialing system(s) it used to call Plaintiff, or an artificial or prerecorded voice, between April 25, 2012 and present, where at least one

of those calls was made after Ally noted the number as Wrong Number or Do Not call in its records.[3]

(Doc. #131, p. 4.)

## II.

The Court takes the following facts relevant to class certification from the evidence offered by the parties[4]:

---

[3] The Court considers the proposed class definition set forth in the Motion even though it is different from the class definition set forth in plaintiff's Complaint (Doc. #1). Defendant argues that the Court should not accept the revised definition because plaintiff failed to file an amended complaint and discovery thus far has been focused on the original class definition. The Court will accept the revised definition. Defendant has not otherwise shown prejudice as the revised class definition is a narrower version of the original class definition, which is generally allowable. See Abdeljalil v. General Electric Capital Corp., 306 F.R.D. 303, 306 (S.D. Cal. 2015). See also Chapman v. First Index Inc., 796 F.3d 783 (7th Cir. 2015).

[4] A review of the docket shows that the parties have engaged in extensive discovery, with discovery closing on October 20, 2017. (Doc. #54.)   "'Sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a  rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," ("[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable."). Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011). Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.   '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"   Id. (internal citations omitted) (quoting General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1980)).

## A. Plaintiff's Purchase and Use of the Phone

Plaintiff obtained the telephone number ending in -5001 ("No. 5001" or "Phone") in November 2015 from MetroPCS when he upgraded his cellular phone. (Doc. #86-2 at 38:4-8; 48:16-49:4.) Plaintiff began receiving calls from Ally "as soon as he got the phone," asking to speak with Everett. (Id. at 70:16-22; 71:6-22.) Sometimes the call was automated and a voicemail was left. (Id. at 72:12-18; 74:15-18.) Plaintiff remembers answering two of the calls and telling Ally they had the wrong number. (Id. at 72:23-24; 76:1-6; 101:8-10.) MetroPCS's records show that plaintiff received 22 calls from Ally between January 30, 2016 and April 2016. (Doc. #88-3.)

## B. Ally's Actions[5]

For purposes of the TCPA, before Ally leverages any automated dialing systems to attempt a call to a customer it first assures that it has the customer's express consent to call. Declaration of Diane Accurso (Doc. #133-1, ¶¶ 7-17.)[6] Consent is most often obtained at the time of credit or financing application. Ally's

---

[5] As plaintiff seeks to certify a nationwide class, Ally's procedures as to all of its customer's accounts is relevant to class certification.

[6] The docket numbers cited refers to the redacted versions of the declarations Ally offered in opposition (Docs. ##133-1 - 133-27), which are publicly available on CM/ECF. The Court has reviewed the sealed, unredacted declarations and other evidence submitted by Ally.

application materials request that customers provide their phone numbers and the vast majority of customers do so.  (Id. at ¶ 8.) These applications contain cell phone consent disclosures, as do most of the credit agreements Ally purchases.  Id.; Declaration of Sandra Hampton (Doc. #133-11, ¶¶ 3-5.)  For example, Mr. Everett's application underlying Ally's calls in this case provides:

> By providing your cell phone number on this application you are consenting to receive servicing and collection calls on your cell phone using an auto dialer or a prerecorded message.

(Doc. #133-1, ¶ 8; Doc. #133-2.)

In setting up an account, Ally's agents or system review each application to assure that a consent disclosure exists within the agreement.  (Doc. #133-1, ¶¶ 11-12.)  If so, the phone number provided on the application is entered in Ally's CARS system (Ally's customer account management system), noted as "C" to permit the use of automated technology to contact the number.  (Id.)  If not, then the number is coded as a "P" and no automated calls are attempted unless and until express consent is obtained from the customer.  (Id.)  Consent may also be obtained when a customer provides a phone number to an Ally agent during a live contact. (Id. at ¶ 13.)  In those circumstances, Ally's agents are trained to read a script asking the customer whether Ally may contact that number using automated technology.  (Id.)  Only if the response

is a clear "yes" may the agent code the number as consented.  (Id. at ¶¶ 13-14.)  And only if the number is coded as consented will Ally contact that number using automated technology.  (Id. at ¶¶ 11, 16, 17, 20, 23); Declaration of Aaron Heiner (Doc. #133-7, ¶¶ 5-6.)

### 1. "Do Not Call" Requests

Occasionally a call recipient will advise that he or she no longer wishes to receive calls.  In that instance, agents are to update the phone number "status code" field in SHAW (Ally's customer collections system), which writes to CARS and changes the phone number to suppress further dialer calls.  (Doc. #133-1, ¶ 6.)  In the instance of an oral "do not call" report by a call recipient, the agent enters an "x" in the status code update field in SHAW.  (Id. at ¶ 23.)  This entry automatically edits the cell phone number in the CARS system (the two systems "talk" to each other) to replace the first digit of the number with an "x."  (Id.) The entry of an "x" code necessarily prevents any further dialing to that number - the automated dialer cannot attempt a call to a letter.  (Id.)

Agents are also directed to update the permission code in CARS to an "N" which will also cease further dialer calls to the number.  Ally's policy is that this must be done "immediately."  (Doc. #133-1, ¶ 24.)  However, calls to a number previously marked as an "x" may continue if the customer re-consents to receive calls

on that number.   (Id. at ¶¶ 29, 34.)   It is a very common
occurrence for Ally customer's to re-consent to receive calls.
(Id. at ¶ 34); Declaration of Stephen Johnson (Doc. #133-8, ¶ 11;
Declaration of Shada Hall (Doc. #133-9, ¶ 8); Declaration of Jordan
McClure (Doc. #133-10, ¶ 8).

   **2. "Wrong Number" Notations**

   Calls to wrong numbers sometimes occur as a customer's phone
may change hands without Ally's knowledge, which is what occurred
with respect to the phone number at issue in this case.   (Doc.
#133-1, ¶ 28.)   Wrong number reports are not very reliable in the
debt collection context.   (Id. at ¶¶ 25-28.)   Sometimes the
delinquent customer pretends to be a third party in order to
procrastinate or avoid paying sums owed.   (Id. at ¶ 27; Doc. #133-
8, ¶ 3; Doc. #133-9, ¶ 3; Doc. #133-10, ¶ 3; Doc. #133-22, ¶ 12 –
Expert Report of Ken Sponsler ("Sponsler Report")).   Sometimes a
third party uses the phrase "wrong number" merely as a shorthand
way of explaining that the customer is not available at that time,
although the number is perfectly valid.   (Doc. #133-1, ¶ 28; Doc.
#133-8, ¶ 3; Doc. #133-9, ¶ 4; Doc. #133-10, ¶ 4.)

   Ally's agents can treat a number as valid following a "wrong
number" report if: i) the number is correct but the customer is
not available at the number; ii) the person knows the customer and
says the customer can be reached at the number; or iii) the person
can provide location information on the customer and indicates

calls may continue.  (Doc. #131-1; Doc. #133-8, ¶ 4.)  In these instances, Ally states that the number is not really a "wrong number."  Instead, the number called was the preferred number at which the customer desired to be reached, but the customer was simply unavailable at that time.

If, however, the number cannot be validated, then the agent must treat the number as invalid and assure that the number is not dialed again.  (Doc. #133-8, ¶ 5; Doc. #133-10, ¶ 6; Doc. #133-9, ¶ 6.)  In that instance, the agent must enter a "w" in the status code update field in SHAW.  (Id.)  This entry automatically edits the cell phone number in the CARS system to replace the first digit of the number with a "w."  (Doc. #133-1, ¶¶ 6, 20; Doc. #133-7, ¶¶ 5-6.)  The entry of a "w" code necessarily prevents any further dialing to that number.  (Id.)

### 3. Ally Agent Free Form Notes

Ally agents are required to document the outcome of all calls in SHAW by typing free form text notes into the system, regardless of whether or not a number remains valid.  See, e.g., Doc. #133-10, ¶ 5; Doc. #133-8, ¶ 6.  The vast majority of SHAW notes will have nothing to do with an invalid phone number.  Agents are free, however, to use their own language in entering those notes.  See Doc. #133-10, ¶ 5; Doc. #133-9, ¶ 5.  Therefore, an agent may enter a phrase, as occurred in this case, such as "do not call" or "wrong number," a free form note for a myriad reasons that have

nothing to do with the validity of a phone number.  See, e.g., Doc. #133-1, ¶¶ 26-27, 30, 32-33; Doc. #133-8, at 5-10; Doc. #133-9, ¶ 4; Doc. #133-10, ¶ 4; Sponsler Report, ¶¶ 11(j), 12.

Ally has provided Declarations from its employees that provide examples of "do not call" notations that did not denote that the phone number was invalid or should never be called again because the customer revoked consent.  Examples include: the agent might be notating a request that the customer not be called at a certain time, or on certain days, or for a certain period of time, or regarding a certain payment deficiency.  (Doc. #133-8, ¶ 8; Doc. #133-9, ¶ 4; Doc. #133-10, ¶ 4.)  The note may refer to a different number than the number called.  (Id.)  It may be a request that Ally not call a customer at work, or not call references, or not call a landline.  (Id.)  Ally's policy is to confirm and update customer information during each call; therefore, it is common for customers with multiple numbers to update one phone number but not the other, particularly residential land lines that may change when a customer moves; whereas, the cell phone number may not change.  (Doc. #133-8, n.1.)  Further, the phrase "wrong number" may refer to account numbers, addresses, or any other personal identifying information that may have been corrected by a customer during a phone call. (Doc. #133-1, ¶ 26; Doc. #133-8, ¶ 6; Doc. #133-9, ¶ 4; Doc. #133-10, ¶ 4.)  These circumstances occur with some frequency.  See, e.g., Doc. #133-8,

¶¶ 5-6; Doc. #133-9, ¶ 4; Doc. #133-10, ¶ 4; Sponsler Report, ¶ 11(j).

Ally concedes that there is a "wrong number" free form text in its records in connection with No. 5001, dated January 21, 2016. (Doc. #86-1, p. 3.)  Although the document is heavily redacted (even the version filed under seal), the Court notes that the notation reads: "(561) 201-**** (GOOD) WRONG #".  (Id.) Apparently though, a "w" was not updated in the status code field in SHAW because Tillman was called after the date of the free form notation.  A free form note "do not call" was noted for the Phone in Ally's records on April 29, 2016[7] (one day after this case was filed), and plaintiff was not called after the entry of that note. (Doc. #133-1, ¶ 33; Doc. #117-1, p. 22.)

**4. Consent Clauses**

The proposed class will consist of both customers and non-customers of Ally; therefore, some class members will have a contractual relationship with Ally, while others will not.  Ally states that the consent clauses within its contracts come in different forms and contain different language[8], but a vast

---

[7] Ally has filed a Motion for Rule 11 Sanctions (Doc. #138) because plaintiff previously represented to the Court that the last call was April 21, 2016, and that calls were made after that date.  The Court will not impose sanctions as plaintiff corrected this error in its motion for class certification, amending the date to April 29, 2016.

[8] This may be the case because financing contracts with a

majority of Ally's approved credit applications include consent language similar to the following:

> By providing your cell phone number on this application you are consenting to receive servicing and collection calls on your cell phone using an auto dialer or a prerecorded message.  This consent applies to the dealer, who is the originating creditor in this transaction, as well as any assignee who may purchase your credit contract from the dealer.

(Doc. #133-11, ¶¶ 4, 5-7.)  Customers who sign the finance agreements also agree that "[a]ny change to this contract must be in writing and we must sign it.  No oral changes are binding." (Doc. #133-11, Ex. C, D, E, F, G; Doc. #133-2, at ALLY000002.)

### 5. Arbitration Clauses

Ally has offered evidence that many of the finance agreements contain arbitration clauses and a waiver of the right to participate in a class action.  (Doc. #133-11, ¶¶ 7-9, and exhibits.)

### III.

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure.  Under Rule 23(a), the party seeking certification must first demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;

---

dealership may be purchased by Ally.  (Doc. #133-11, ¶ 6.)

       (3) the claims or defenses of the representative parties
           are typical of the claims or defenses of the class;
           and

       (4) the representative parties will fairly and
           adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011).  The proposed class must then satisfy at least one of the requirements listed in Rule 23(b).  Here, plaintiff seeks to certify a nationwide Rule 23(b)(3) class.  To maintain a class action under Rule 23(b)(3) requires finding both: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

    "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule - that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  Dukes, 564 U.S. at 349.  "[I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  Comcast Corp. v. Behrend, 569 U.S. 27 (2013)

(internal citations omitted).  "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'"  Id. (quoting Dukes, 564 U.S. at 349).  The same analytical principles govern Rule 23(b).  Id.

### A. Standing

As a threshold matter, plaintiff must have standing pursuant to Article III to raise each class claim.  Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1321 (11th Cir. 2008).  Defendant challenges Tillman's standing because he is not a member of the pleaded class as set forth in plaintiff's Complaint.  (Doc. #89.)  The Court has already determined that plaintiff has Article III standing to pursue the class claims (Docs. ##58, 141), and the Court will not re-address standing here.

### B. Commonality and Predominance

The crux of this case, and where it fails, is commonality and predominance.  The "commonality requirement measures the extent to which all members of a putative class have similar claims. 'Traditionally, commonality refers to the group characteristics of the class as a whole [while] typicality refers to the individual characteristics of the named plaintiff in relation to the class.' [Prado-Steiman, 221 F.3d at 1279].  Under commonality, 'a class action must involve issues that are susceptible to class wide proof.'"  Cooper v. Southern Company, 390 F.3d 695, 714 (11th Cir. 2004) (overturned on other grounds) (citing Murray v. Auslander,

244 F.3d 807, 811 (11th Cir. 2001)).   "What matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.   Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Dukes, 564 U.S. at 350-51.   In Dukes, the Supreme Court focused the inquiry as follows:

> Their claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor.   That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Id. at 350.   Proof of commonality may overlap with plaintiff's merits contention.   Id. at 352.

To obtain Rule 23(b)(3) class certification, the issues in the class action that are subject to generalized proof and applicable to the class as a whole must predominate over those issues that are subject only to individualized proof.   Babineau v. Federal Exp. Corp., 576 F.3d 1183, 1191 (11th Cir. 2009). "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief."   Williams v. Mohawk Industries, Inc., 568 F.3d 1350, 1357

(11th Cir. 2009) (citation omitted).  The predominance inquiry is more demanding that the commonality requirement of Rule 23(a). Vega v. T-Mobile, USA, 564 F.3d 1256, 1270 (11th Cir. 2009) (citing Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1233 (11th Cir. 2000)).  The common issues will not predominate over individual questions if the "resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues."  Bussey v. Macon Cty. Greyhound Park, Inc., 562 F. App'x 782, 789 (11th Cir. 2014) (quoting Babineau, 576 F.3d at 1191).  Moreover, certification is inappropriate if the "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims."  Id.

Plaintiff identifies the following common questions of law or fact which he alleges are capable of class-wide resolution:

> 1. Whether the phone calls were placed with a technology prohibited by the TCPA ("automatic telephone dialing system" and artificial or prerecorded voices);
>
> 2. Ally's policies and practices with respect to Wrong Number and Do Not Call notations; and
>
> 3. Whether Ally's violations of the TCPA were willful under § 227(b)(3).

(Doc. #131, p. 13.)  In essence, plaintiff asserts that lack of consent is an issue common to the class.

Here, while the legal issues might be the same for each putative plaintiff, consideration of Ally's policies and

procedures shows that individual factual issues abound that are not capable of class-wide resolution.   For example, Ally's evidence demonstrates that the Court would be required to make individualized determinations as to whether each class member had entered a contract with Ally (as some would be customers of Ally, and others would not be), which version of the contract they entered into, the consent language (if any) contained within the contract, and whether the contract contains an arbitration provision whereby the putative plaintiff waived their right to proceed in a class action.[9]   Indeed, a majority of the contracts do contain such provisions but not all of the contracts are uniform.

Moreover, plaintiff fails to demonstrate how consent (or lack thereof) can be established through class-wide proof, as Ally has offered evidence that it is common for customers to revoke consent and then reinstate it.   And adding to the unique and individualized nature of the consent issue, the Eleventh Circuit recently held that under the TCPA, a customer may partially revoke consent to receive automated calls, adding yet another layer of individual inquiry.   See Schweitzer v. Comenity Bank, 866 F.3d 1273, 1277

---

[9] Such provisions in consumer contracts have been found to be valid.   See Cruz v. Cingular Wireless LLC, 648 F.3d 1205, (11th Cir. 2011).   An additional individual issues would arise if class members were to challenge the arbitration provision as unenforceable.   See Larsen v. Citibank FSB, --- F.3d ---, 2017 WL 4250074, *3 (11th Cir. Sept. 26, 2017).

(11th Cir. 2017).  In addition, individualized inquires in certain circumstances might be needed to determine an individual's authority to provide consent to call, or to revoke consent. Therefore, the Court finds that individualized inquiries and determinations as to consent predominate.

There is also a wide variety of circumstances under which the free form notes "wrong number" and "do not call" may be entered into Ally's system that have nothing to do with the validity of the underlying phone number such that it would not be a TCPA violation for Ally to continue to call that individual after such free form notes were made.  Nor do the notes mean that consent is lacking.  The circumstances of such call notes for one class member would look different than the circumstances of another.  Indeed, defendant has offered evidence that in the debt collection industry "wrong number" oftentimes does not mean non-consent because many customers tell agents they have reached the wrong number, though the correct number was called, as a way to avoid further debt collection.  Thus, "wrong number" and "do not call" notations are insufficient to establish on a class-wide basis without individualized inquiry that defendant made a call to a number in violation of the TCPA.  See Babineau, 576 F.3d at 1191 (noting that a class should not be certified if it appears that most of the plaintiffs' claims have highly case-specific factual issues).

Notably, there could be members of the class where a "wrong number" or "do not call" notation was made on the second call and Ally never called the person again.[10]   Thus, the class definition includes members which would have no valid TCPA claim against Ally.[11]

Plaintiff fails to demonstrate how these individualized inquiries would be susceptible to class-wide proof, and fails to show that common issues would predominate our individualized issues, rendering class treatment inappropriate.

### IV. Magistrate Order Objections

Plaintiff has filed a sealed Objection (Doc. #139) to the Magistrate Judge's April 17, 2017 Order (Doc. #128), alleging that the Magistrate Judge erroneously denied the following motions: (1) Motion for Protective Order (Doc. #104); (2) Plaintiff's Renewed Motion to Compel Production of Discovery (Doc. #107); and (3)

---

[10] See 2015 FCC Order, at 8000-01 (affording wrong number callers a one call safe harbor for calls made with a customer's consent).   Indeed, in this case, there is no evidence that Ally called plaintiff after the "do not call" notation was made on April 29, 2016.

[11] This also makes the class definition administratively unfeasible.   "One threshold requirement is not mentioned in Rule 23, but is implicit in the analysis: that is, the plaintiff must demonstrate that the proposed class is 'adequately defined and clearly ascertainable.'"   Bussey v. Macon Cty. Greyhound Park, Inc., 562 F. App'x 782, 787 (11th Cir. 2014) (quoting Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012)). "Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual inquiry."   Id.

Plaintiff's Motion for Extension of Time to File Motion for Class Certification (Doc. #111).

A magistrate judge is authorized to hear and determine pretrial matters regarding discovery disputes. 28 U.S.C. § 636(b)(1)(A); Local Rule 6.01, United States District Court, Middle District of Florida. A district judge may reconsider such matters only upon a showing that the magistrate judge's order was clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). Having reviewed the Order (Doc. #128), plaintiff's objections (Doc. #139), and defendant's response (Doc. #147), the Court finds that the challenged Orders are not clearly erroneous or contrary to law and overrules plaintiff's objections.

Plaintiff's objections center around the argument that Judge Mirando's Orders preclude him from receiving documents and data from Ally identifying phone numbers called or call notations that were made and plaintiff was therefore prejudiced in his ability to present evidence of common circumstances and practices at the class certification stage. In her Orders, Judge Mirando refused to compel Ally to produce burdensome discovery based in part on the fact that plaintiff's proposed class and subclass definitions contained in the Complaint were open to alteration or denial by the District Court at the class certification stage, noting that the definitions appeared to set forth a "fail safe" class. Yet since the time of Judge Mirando's ruling, plaintiff amended its

class and subclass definitions in response to the fail safe concerns.   Thus, the issues plaintiff raises in his Objections have not yet been before Judge Mirando.   In other words, the Magistrate Judge has not yet had the opportunity to determine whether discovery is appropriate in light of the new class definitions raised after she issued her rulings.

In any event, having reviewed the nature of the underlying discovery dispute at issue and the discovery requests (Doc. #139, pp. 5-6), even if plaintiff received the requested information and documents it would still not ameliorate the fact that individual issues predominate, _i.e._, a search of Ally's records would not reveal whether the call recipients who claimed "wrong number" in fact had revoked their consent to call.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Plaintiff's Motion to Certify Class (Doc. #131) is **DENIED.**

2. Plaintiff's Motion to Certify Class (Doc. #118) and Motion to Certify Class, Corrected (Doc. #119) are **terminated as duplicative.**

3. Defendant's Motion for Rule 11 Sanctions (Doc. #138) is **DENIED.**

4. Defendant's Motion to Deny Class Certification (Doc. #74); Plaintiff's Motion to Strike Motion to Deny Class Certification

(Doc. #77); and Sealed Motion to Deny Class Certification (Doc. #89) are **DENIED AS MOOT.**

5. Plaintiff's Objections to Magistrate Judge's Order (Doc. # 135, redacted) and (Doc. #139, sealed) are **OVERRULED.**

6. Plaintiff's Unopposed Motion for Extension of Time to Disclose Expert Report (Doc. #159) is **DENIED AS MOOT.**

**DONE and ORDERED** at Fort Myers, Florida, this   29th   day of September, 2017.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record